**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF MIKAL R. GAITHER, by and through Pearl Gaither, Personal Representative,<br><br>    Plaintiff,<br><br>      v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>    Defendants. | Civil Action No. 03-1458 (CKK) |

**MEMORANDUM OPINION**
(September 8, 2009)

The above-captioned matter was filed by Plaintiff Pearl Gaither as mother and personal

representative of the Estate of Mikal R. Gaither, who was fatally stabbed on December 14, 2002,

while incarcerated at the District of Columbia Central Detention Facility ("CDF" or the "Jail").

Plaintiff named as Defendants the District of Columbia ("D.C." or the "District"); Odie

Washington, both individually and in his official capacity as Director (now-retired) of the D.C.

Department of Corrections; Marvin L. Brown, both individually and in his official capacity as

Warden (now-retired) of the Jail; Dennis Harrison, both individually and in his official capacity

as Associate Warden of Operations of the Jail; Zerline Brooks, in her individual capacity;

Gounod Toppin, in his individual capacity; and Joseph White, in his individual capacity[1]

---

[1] For convenience, the Court shall refer to Defendants Washington, Brown, and Harrison collectively as "Defendant Officials," and shall refer to Defendants Brooks, Toppin and White collectively as "Defendant Correctional Officers."

(collectively, "Defendants").[2]  As set forth in Plaintiff's Second Amended Complaint, Plaintiff alleges that Gaither's death resulted from Defendants' negligence as well as their deliberate and reckless indifference to conditions at the Jail that they knew were unconstitutionally dangerous. Plaintiff asserts three causes of action in her complaint against all Defendants, alleging a claim for violation of Gaither's constitutional rights pursuant to 42 U.S.C. § 1983 ("Section 1983"), as well as claims for negligence/survival action and wrongful death.

Presently before the Court are Defendants' [146] Motion for Summary Judgment and Plaintiff's [147] Motion for Partial Summary Judgment.  After thoroughly reviewing the parties' submissions, including the attachments thereto, applicable case law, statutory authority, and the record of the case as a whole, the Court shall GRANT-IN-PART and DENY-IN-PART Defendants' Motion for Summary Judgment and shall GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion for Partial Summary Judgment, for the reasons set forth below.

More specifically, the Court GRANTS Defendants' motion insofar as Defendants seek dismissal of Plaintiff's claims against the Defendant Officials in their official capacity as redundant of her claims against the District and with respect to the Defendant Correctional Officers' claims of qualified immunity as against Plaintiff's Section 1983 claim.  The Court, however, DENIES Defendants' motion insofar as Defendants assert that issue preclusion bars Plaintiff's Section 1983 claim.  The Court also DENIES Defendants' motion with respect to

---

[2] Plaintiff also named as Defendants in this action John Does 1-20.  Although discovery in this case is now closed, the docket does not reflect any efforts on Plaintiff's part to identify or serve the Defendants named only as "John Does 1-20" in the Second Amended Complaint. Plaintiff is therefore required to file a status report with the Court, on or before September 30, 2009, explaining why John Does 1-20 have not been served.  If no such explanation is timely filed, the Court shall dismiss Does 1-20 as Defendants in this action, pursuant to Federal Rule of Civil Procedure 4(m).

Plaintiff's Section 1983 claim against the District, Plaintiff's negligence-based claims against all

Defendants, and the Defendant Officials' claims of qualified immunity as against Plaintiff's

Section 1983 claim, finding that genuine issues of disputed material fact preclude summary

judgment.

With respect to Plaintiff's Motion for Partial Summary Judgment, the Court GRANTS

Plaintiff's motion as conceded to the extent she seeks an order precluding Defendants from

raising an affirmative defense based on allegations that Gaither voluntarily involved himself in

an altercation, but DENIES Plaintiff's motion to the extent she seeks a similar order precluding

Defendants from raising such affirmative defenses based on allegations that Gaither should have

notified Jail officials of his involvement with a grand jury murder investigation.

Accordingly, Plaintiff's remaining claims are as follows: (1) Plaintiff's Section 1983

claim against the District and the Defendant Officials in their individual capacities; and (2)

Plaintiff's negligence-based claims against the District, the Defendant Officials in their

individual capacities, and the Defendant Correctional Officers in their individual capacities.

## I.  BACKGROUND

### A.    Factual Background

On December 14, 2002, Mikal Gaither was fatally stabbed by a fellow inmate while

incarcerated at the Jail.  Pl.'s Stmt. ¶ 1.[3]  The stabbing occurred while Gaither was housed in the

---

[3] The Court notes that it strictly adheres to the text of Local Civil Rules 7(h) and 56.1 when resolving motions for summary judgment.  Accordingly, as the Court advised the parties, it "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  *See* 9/4/08 Order, Docket No. [133] at 2-3.  Thus, in most instances the Court shall cite only to Plaintiff's Statement of Material Facts submitted in support of her Partial Motion for Summary Judgment ("Pl.'s Stmt.") or Defendants' Statement of Material Facts submitted in

in the Northeast Three Cellblock ("NE-3") of the Jail. *Id.* At the time of Gaither's death,

Defendant Washington was Director of the D.C. Department of Corrections, Defendant Brown

was the Warden for the Jail, and Defendant Harrison was the Deputy Warden for Operations at

the Jail. Defs.' Stmt. ¶¶ 5-7. Defendants Toppin, Brooks, and White were the correctional

officers assigned to NE-3. *Id.* ¶¶ 8-10.[4]

Although neither party in their briefing now before the Court has specifically addressed

Gaither's status at the Jail at the time of his death, it is the Court's understanding from previous

filings in this case that Gaither was in Jail awaiting sentencing in the D.C. Superior Court, having

earlier pled guilty to one felony count of distribution of cocaine.[5] For reasons that are unclear,

---

support of their Motion for Summary Judgment ("Defs.' Stmt.") unless a statement is
contradicted by the opposing party. Where either party has objected to relevant aspects of the
other side's proffered material fact, the Court shall cite to Plaintiff's Response to Defs.' Stmt.
("Pl.'s Resp."); Defendants' Response to Pl.'s Stmt. ("Defs.' Stmt."); Plaintiff's Reply Statement
to Defs.' Resp. (Pl.'s Reply Stmt."); or Defendants' Reply Statement to Pl.'s Resp. (Defs.' Reply
Stmt."). In addition, where appropriate, the Court shall cite directly to evidence in the record.

[4] As set forth in Plaintiff's Second Amended Complaint, Gaither's stabbing was the last
of three such incidents that took place at the Jail during a four-day period in December of 2002.
On December 11, 2002, Gavin Pendleton was stabbed and subsequently died as a result of his
injuries. Two days later, on December 13, 2002, a second inmate, Bradley Autman, was stabbed
in the neck by another inmate, resulting in his hospitalization. This was followed a day later by
Gaither's stabbing. Sec. Am. Compl. ¶ 3. Although these facts are material to Plaintiff's suit,
neither party actually addressed the prior stabbings in their statement of material facts or
provided the Court with record support for these statements. Accordingly, although the Court
makes note of these facts in order to provide a fuller background of this case, the Court has not
relied on these statements in ruling on the parties' motions.

[5] *See, e.g.,* Def.'s Mot. to Strike Pl.'s Expert Michele Roberts and One of Plaintiff's
Penologists as Duplicative, [Docket No.113], Ex. C, (Report of Michele A. Roberts, Esq.) at 1
("Having pleaded guilty to one count of distribution of cocaine, Mikal Gaither was in the custody
of the D.C. Jail pending sentencing on December 14, 2002."); Pl.'s Mem. of Law in Support of
her Obj. to Magistrate Judge Kay's Order Striking Plaintiff's Sentencing Expert, Docket No.
[122-2], at 5 ("At the time of his death, Mr. Gaither was awaiting sentencing in the D.C. Superior
Court on a felony drug conviction. Mr. Gaither pled guilty to one felony count of distribution of

however, the Second Amended Complaint incorrectly alleges that "Mr. Gaither was fatally

stabbed . . . while he was a *pretrial* detainee at the Jail *awaiting trial on drug charges*."  Second

Amended Complaint, Docket No. [34] ("Sec. Am. Compl.") ¶ 2 (emphasis added).[6]  Quite

obviously, having already pled guilty, Gaither was not—as the Second Amended Complaint

asserts—awaiting trial, but rather was awaiting sentencing only.  The Court highlights this fact at

the outset because, as will become clear below, Gaither's status at the Jail at the time of he was

stabbed is constitutionally-significant.

　　　In the wake of Gaither's death, the D.C. Metropolitan Police Department ("MPD")

conducted an investigation into his stabbing at the Jail, and concluded that two of Gaither's

fellow inmates at the Jail, Delonte Kent and Matthew Ingram, had forced Gaither into an open

cell in the NE-3 cellblock, where they proceeded to stab him, causing the injuries that ultimately

killed Gaither.  Pl.'s Stmt. ¶¶ 13-14.  A D.C. Superior Court Grand Jury indicted Kent and

Ingram for Gaither's First-Degree Murder.  *Id.* ¶ 14.  The Grand Jury found that Gaither had been

killed because of his previous involvement in the grand jury investigation into the murder of an

individual by the name of Kenneth Muldrow, Jr.  Pl.'s Stmt. ¶ 15.  Ingram and Kent were

subsequently tried for Gaither's murder, but were found "not guilty" by the jury on December 13,

2006.  *See* Joint Status Report and Consent Motion to Lift Stay, Docket [30].

　　　The remaining facts surrounding Gaither's incarceration at the Jail in December of 2002

_____

cocaine . . . .").

　　　[6] Indeed, Gaither is referred to throughout the Second Amended Complaint as a "pretrial
detainee."  *See, e.g.* Sec. Am. Compl. at ¶¶ 2, 63, 76.  Plaintiff's use of this term in the Second
Amended Complaint perhaps reflects the Jail's apparent practice of referring to all inmates who
have not yet been sentenced as "pretrial detainees," regardless of whether they are awaiting trial
or have already been convicted and/or pled guilty.

are largely in dispute.  In particular, the parties disagree as to many of the material facts relating

to the policies, procedures and practices, as well as the conduct of the Defendant Correctional

Officers, that Plaintiff alleges led to Gaither's death.  Given the sheer number of factual issues

raised by the parties and the number of allegations and defendants involved in this lawsuit, for

clarity's sake, the Court shall address the remaining facts below in discussing and ruling upon the

parties' specific arguments.

   B.   *Procedural Background*

   As explained above, Plaintiff, as mother and personal representative of the Estate of

Mikal R. Gaither, filed the above-captioned lawsuit on July 1, 2003.  *See* Compl., Docket No.

[1].  On October 6, 2003—before Defendants' response to Plaintiff's complaint was due— the

District moved, with Plaintiff's consent, for an order staying this civil case pending resolution of

the criminal investigation into Gaither's death that was being conducted by the MPD.  *See*

Consent Mot. of Def. D.C. to Stay Pending Outcome of Criminal Case, Docket No. [7].  The

Court granted the District's motion, and the case was stayed, effective October 8, 2003, pending

further notice from the parties.  *See* 10/8/03 Min. Order.  The stay remained in place until

January 4, 2007, when the Court granted the parties' joint request to lift the stay based upon their

representation that the criminal investigation into Gaither's death was now complete and the

related criminal trials had recently concluded.  *See* Joint Status Report and Consent Mot. to Lift

Stay, Docket No. [30]; *see also* 1/4/07 Min. Order.

   Plaintiff filed her Second Amended Complaint on February 9, 2007, shortly after the stay

in this case had been lifted.  *See* Sec. Am. Compl., Docket No. [34].  Plaintiff asserts three

separate causes of action against Defendants.  First, Plaintiff sets forth a claim pursuant to

Section 1983 for violation of Gaither's Fifth Amendment rights.  More specifically, with respect to the Defendant Officials (in both their official and individual capacities) and the District (whom Plaintiff asserts is liable for the conduct of the Defendant Officials), Plaintiff alleges that they subjected Gaither to a "serious and unreasonable risk of violent injury as a result of the unconstitutional conditions at the Jail that were well-known to the defendant officials," including "pervasive violence; overcrowding; a shortage of necessary correctional officers; inadequate training of correctional officers; negligent supervision of correctional officers; inadequate policies, procedures, and practices for critical staffing, classification, and security; and failure to enforce such policies, procedures, and practices relating to critical staffing and security that were in effect."  *Id.* ¶ 63.  According to Plaintiff, the "[d]efendant officials' ongoing failure to address these unconstitutionally dangerous conditions was the result of a conscious and deliberate decision or of reckless disregard for the safety of inmates at the Jail," which conduct violated Gaither's Fifth Amendment rights in two distinct ways: one, by "directly and proximately caus[ing] Gaither's injuries and death in violation of the Fifth Amendment and 42 U.S.C. § 1983;" and two, by being of such an "egregious and outrageous [nature] that it shocks the contemporary conscience, thereby also depriving plaintiff of substantive due process in violation of the Fifth Amendment and 42 U.S.C.  § 1983."  *Id.* ¶¶ 64-66.

With respect to the Defendant Correctional Officers, Plaintiff alleges that "one of the three correctional officers assigned to the NE-3 Housing Unit left her post with the acquiescence of the other assigned correctional officers without first arranging for temporary coverage of her post by a relief officer," and that "[t]his and other conduct by the defendant correctional officers was deliberately indifferent to and recklessly disregarded the substantial and unreasonable risk of

7

harm to Gaither," thereby violating Gaither's Fifth Amendment rights in two distinct ways: one, by "proximately caus[ing] his injuries and death," and two, by being of such an "egregious and outrageous [nature] that it shocks the contemporary conscience." *Id.* ¶¶ 69-71.

Second, Plaintiff alleges a negligence/survival action against all Defendants. With respect to the Defendant Officials, Plaintiff asserts that they "failed to require reasonably frequent and unannounced housing unit, inmate, and cell shakedowns; to provide for the installation of metal detectors and necessary security cameras; to provide adequate numbers of correctional officers to cellblocks at all times; and to provide proper training and supervision for correctional officers and other employees." *Id.* ¶ 75. Plaintiff further alleges that the "Defendant officials knew, or should have known that, as a result of these and other necessary and generally accepted prison-security policies, practices and resources for which they had responsibility, it was reasonably foreseeable that pre-trial detainees such as Gaither would be attacked and seriously injured by other inmates." *Id.* ¶ 75. With respect to the Defendant Correctional Officers, Plaintiff alleges that they "knew or should have known that, as a result of their failure to maintain a level of three correctional officers on duty at all times during the day and evening shifts in Northeast Three cellblock; to control contraband; and to take practical steps to control and monitor the activity and movement of inmates when they were permitted to leave their cells, it was reasonably foreseeable that inmates such as Gaither would be attacked and seriously injured by other inmates." *Id.* ¶ 76. Finally, with respect to the District, Plaintiff alleges that D.C. is "vicariously liable under the doctrine of *respondeat superior* for the acts or omissions" of both the Defendant Officials and the Defendant Correctional Officers. *Id.* ¶ 77.

Third, Plaintiff asserts a claim for wrongful death against all Defendants, alleging that

"[a]s a direct and proximate result" of the Defendants' negligence, as described above, "Decedent Mikal Gaither died on or about December 15, 2002." *Id.* ¶ 80.

Currently pending before the Court are Defendants' Motion for Summary Judgment, *see* Docket No. [146], and Plaintiff's Motion for Partial Summary Judgment, *see* Docket No. [147]. The parties have each filed their respective oppositions and replies. *See* Defs.' Opp'n, Docket No. [157]; Pl.'s Opp'n, Docket No. [155]; Defs.' Reply, Docket No. [162]; Pl.'s Reply, Docket No. [163].  The motions are thus fully briefed and now ripe for the Court's resolution.

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary

judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the

factual assertion must be capable of affecting the substantive outcome of the litigation; to be

genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-

fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.

Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.

Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial

responsibility of identifying those portions of the record that demonstrate the absence of a

genuine issue of material fact, the burden shifts to the non-movant to "come forward with

'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P.

56(e)) (emphasis in original).

## III.  DISCUSSION

The Court turns first to consider Defendants' motion for summary judgment, which

advances several arguments—many in the alternative—with respect to both Plaintiff's

constitutionally-based and negligence-based claims.  First, Defendants argue that Plaintiff's

Section 1983 claim, as asserted against all Defendants, is barred by the doctrine of issue

preclusion.  Second, Defendants contend that Plaintiff's claims (both constitutionally-based and negligence-based) against the Defendant Officials in their official capacity, as opposed to their individual capacity, should be dismissed as redundant of her claims against the District.  Third, Defendants assert that Plaintiff's Section 1983 claim against the District must fail because Plaintiff cannot substantively prove her claim for municipal liability.  Fourth and fifth, Defendants contend that the Defendant Officials and the Defendant Correctional Officers, respectively, are entitled to qualified immunity as against Plaintiff's Section 1983 claim.  Fifth and finally, Defendants argue that Plaintiff's negligence-based claims against all Defendants must fail because she cannot show that the Defendants violated any applicable national standards of care.[7]

The Court will then consider the merits of Plaintiff's motion for summary judgment. Plaintiff has moved on the sole issue of Gaither's contributory negligence and/or assumption of risk, arguing that there is no evidence from which a reasonable jury could conclude that Gaither contributed to or caused his own death.  Plaintiff therefore seeks an order precluding Defendants from raising the defense of contributory negligence and/or assumption of risk at trial.

A.    *The Doctrine of Issue Preclusion Does Not Bar Plaintiff's Section 1983 Claim*

Defendants first contend that Plaintiff's Section 1983 claim against all Defendants is barred because "the issue of whether there existed constitutional violations at the Jail in December 2002, and whether the Jail officials exhibited deliberate indifference to the health and

---

[7] Defendants originally included a sixth argument in their motion for summary judgment—namely, that Gaither's contributory negligence and/or assumption of the risk barred Plaintiff's claims.  *See* Defs.' MSJ at 42-46.  This argument has since been withdrawn by Defendants.  *See* Notice of Withdrawal of Argument, Docket No. [148].

safety of the pretrial detainees and inmates, was already decided in the negative by the U.S.

District Court [of the District of Columbia] in March 2003," in an order issued in two related

civil actions: *Campbell v. McGruder*, Civil Act. No. 71-1462, and *Inmates of D.C. Jail v.*

*Jackson*, Civil Act. No. 75-1668.  Defs.' MSJ at 21.  For the reasons set forth below, the Court

finds that Defendants have failed to meet their burden of demonstrating that issue preclusion

applies to bar Plaintiff's Section 1983 claim.

As an initial matter, although Defendants broadly contend that "[t]he doctrines of res

judicata and/or issue preclusion bars [*sic*] plaintiff's constitutional claims," Defs.' MSJ at 20-21,

it is apparent upon closer review that Defendants have in fact relied only on the doctrine of issue

preclusion in arguing that Plaintiff is barred from litigating certain issues.  The doctrine of res

judicata, which is aimed at "'prevent[ing] repetitious litigation involving the same causes of

action or the same issues,'" is "'usually [] parsed into claim and issue preclusion.'"  *Nextwave*

*Pers. Commc'n, Inc. v. Fed. Commc'n Comm'n*, 254 F.3d 130, 142-43 (D.C. Cir. 2001) (quoting

*I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983)).

"'Under the claim preclusion aspect of res judicata, a final judgment on the merits in a prior suit

involving the same parties or their privies bars subsequent suits based on the same cause of

action.'"  *Id.* at 143 (quoting *I.A.M Nat'l Pension Fund*, 723 F.2d at 946-47).  It applies whether

or not the new claims were actually litigated in the previous action; rather, "[i]t is sufficient if the

claims 'could have been raised' at an earlier juncture."  *Velikonja v. Ashcroft*, 355 F. Supp. 2d

197, 201 (D.D.C. 2005).  By contrast, "'[u]nder the issue preclusion aspect of res judicata, a final

judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated

and determined in the prior suit, regardless of whether the subsequent suit is based on the same

cause of action.'"  *Nextwave*, 254 F.3d at 147 (quoting *I.A.M Nat'l Pension Fund*, 723 F.2d at 947).

Defendants, unfortunately, have ignored this distinction.  They repeatedly assert in their briefing that Plaintiff's claims are barred by "res judicata and/or issue preclusion" without clarifying whether, by adding the phrase "res judicata," they intended to assert that Plaintiff's claims are barred by claim preclusion as well as issue preclusion.  *See generally* Defs.' MSJ at 19-23.  Plaintiff has treated Defendants' arguments on this point as asserting both issue and claim preclusion.  *See* Pl.'s Opp'n at 2-6.  It is apparent, however, that Defendants have in actuality relied solely on the doctrine of issue preclusion—and not the related doctrine of claim preclusion—in arguing that Plaintiff's Section 1983 claim is barred.  For example, Defendants' memorandum in support of their motion for summary judgment sets forth only the elements for issue preclusion (and not for claim preclusion), and cites solely to case law discussing the doctrine of issue preclusion (and not to the doctrine of claim preclusion).  *See* Defs.' MSJ at 19-23.  In addition, Defendants have made no attempt to demonstrate that the particular *causes of action* in the prior lawsuits are identical to those brought in the pending matter, as is necessary in proving the application of claim preclusion.  *See generally id.*; *see also* Defs.' Reply at 36-37.  Finally, Defendants themselves make clear that their arguments on this point are based on an assertion that "the plaintiff in this case cannot relitigate [certain] *issues* in this lawsuit" that were, according to Defendants, already raised in and decided by the district court in *Campbell* and *Inmates of D.C. Jail.*  Defs.' MSJ at 2 (emphasis added).  Thus, despite the lack of clarity in Defendants' briefing, it is apparent that Defendants assert a defense of issue preclusion only.  Accordingly, the Court proceeds with the understanding that Defendants' res judicata argument

is premised solely on the doctrine of issue preclusion.

Turning then to the merits of Defendants' briefing, Defendants argue that Plaintiff's constitutional claim is barred by the litigation in the *Campbell* and *Inmates of D.C. Jail v. Jackson* actions.  Defs.' MSJ at 21.  *Campbell* and *Inmates of D.C. Jail* were both class action lawsuits brought in the United States District Court for the District of Columbia by pretrial detainees and convicted prisoners, respectively, seeking declaratory and injunctive relief against various allegedly unconstitutional conditions at the Jail.  *See Campbell v. McGruder*, 580 F.2d 521, 524 (D.C. Cir. 1978); *Inmates of D.C. Jail v. Jackson*, 416 F. Supp. 119, 120 (D.D.C. 1976). In March of 2003, after more than thirty years of ongoing litigation and court-oversight, Judge William B. Bryant granted the District's motion to terminate all orders for prospective relief previously issued and ordered the cases dismissed.  *See Campbell v. McGruder*, Civil Act. No. 71-1462, Docket No. [867], ("March 21, 2003 Order").  According to Defendants, the March 21, 2003 Order bars Plaintiff's Section 1983 claim because "the issue of whether there existed constitutional violations at the Jail in December 2002, and whether the Jail officials exhibited deliberate indifference to the health and safety of the pretrial detainees and inmates was already decided in the negative by the U.S. District Court [of the District of Columbia] in March 2003." Defs.' MSJ at 21.

In order to demonstrate that issue preclusion applies, the following three conditions must be met:

> First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case.  Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.  Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (internal citations omitted).  Claim preclusion is an affirmative defense, and Defendants, as the party proponent, bear the burden of establishing all necessary elements.  *See* Fed. R. Civ. P. 8(c); *see also Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 835 F.2d 1458, 1463 (D.C. Cir. 1987) (proponent has "the burden of proving res judicata").  Plaintiff contends that Defendants have failed to demonstrate that the issues now raised by Plaintiff were considered and resolved by the court in *Campbell* and *Inmates of Jail*.  Pl.'s Opp'n at 6-9.  The Court agrees.

As an initial matter, Defendants paint with too broad a brush.  The mere fact that both the instant action and the previous civil matters both involve—at the most abstract level—allegations of "constitutional violations" at the Jail is insufficient, by itself, to demonstrate that Plaintiff's constitutional claims are barred by issue preclusion.  There are, quite obviously, a wide variety of "constitutional violations" that an individual may allege, but Defendants have made no effort to identify with any degree of specificity the precise constitutional issues in question.  Similarly, Defendants' broad claim that both cases involve claims about "deliberate indifference" by Jail officials is insufficient to show that issue preclusion is appropriate.  Of course, when viewed from 20,000 feet, almost any case that raises allegations of unconstitutional jailhouse conditions may be said to raise and resolve the same general "issue."  That, however, is not sufficient.  Although the issues raised in and resolved by the previous litigation need not be "precisely the same" as those now raised by Plaintiff, the D.C. Circuit has advised that "the basic issue in both" cases must "nevertheless" be the same.  *McLaughlin v. Bradlee,* 803 F.2d 1197, 1203 (D.C. Cir. 1986) (internal quotation marks omitted).  In considering whether issues are sufficiently similar for purposes of issue preclusion, courts consider whether:  (a) "the issues in the two suits are very

'closely related;'" (b) "there remains at least 'a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first;'" and (c) "evidentiary proceedings in the first action could 'reasonably be expected to have embraced the matter sought to be presented in the second.'" *Id.* (quoting Restatement (Second) of Judgments § 27, comment c (1982)). In this case, Defendants have made no effort to address any of these factors or otherwise demonstrate that the constitutional violations alleged in this case are the same as those in the *Campbell*/*Inmates of D.C. Jail* litigation. For this reason alone, Defendants' claim of issue preclusion must fail.

Regardless, the Court finds that the specific issues raised by Plaintiff in the instant litigation—when considered in the proper scope—were not actually decided by the March 21, 2003 Order in *Campbell*/*Inmates of Jail*, as Defendants claim. On first blush, Defendants' argument appears to have some merit. Plaintiff's suit alleges that unconstitutional conditions at the Jail in late 2002 led to a series of inmate-on-inmate stabbing attacks in December of that year, including the lethal attack on Gaither. *See* Sec. Am. Compl. Similarly, the *Campbell* and *Inmates in Jail* actions alleged unconstitutional conditions at the Jail. Although the earlier actions principally focused on environmental and health issues—such as violations of D.C. Building Code, Plumbing Code, Housing Regulations, Health Regulations, Food Regulations and Fire Code—that are not at issue in this case, the actions also appear to have touched upon safety issues, such as overcrowding and inadequate classification systems, that are also at issue in Plaintiff's suit. *See Campbell*, 416 F. Supp. at 103, 105-06. Nonetheless, upon closer review, it is clear that none of the issues now raised by Plaintiff in fact were raised and decided by the March 21, 2003 Order as Defendants claim.

16

The Court's analysis begins with the March 21, 2003 Order itself.[8]  That order, however, is little more than two pages long and contains no substantive discussion or description of the issues raised and decided by Judge Bryant.  *See* March 21, 2003 Order.  Although Defendants contend that the March 21, 2003 Order "clearly" decided that there were no constitutional violations at the Jail in December 2002, and that Jail officials had not exhibited deliberate indifference to the health and safety of the pretrial detainees and inmates, *see* Defs.'  MSJ at 21, the order itself includes no such sweeping conclusions.  Rather, the March 21, 2003 Order states in substance only that "the Court does not find that prospective relief remains necessary to correct current and ongoing violations of Federal rights at the" Jail, without specifying what "Federal rights" were at issue.  March 21, 2003 Order at 2.  The March 21, 2003 Order itself thus sheds little light on the actual issues decided by Judge Bryant.

Accordingly, to help illuminate the precise issues raised in and decided by the March 21, 2003 Order, Plaintiff, in opposition to Defendants' motion, has provided the Court with copies of

---

[8] Curiously, although Defendants' argument rests on the preclusive effect of this March 21, 2003 Order, Defendants have not actually provided the Court with a copy of that order.  Rather, Defendants have submitted only a copy of Judge Bryant's July 22, 2003 Order dismissing the *Campbell* and *Inmates of D.C. Jail* cases in their entirety and a copy of the D.C. Circuit mandate affirming the dismissal.  *See* Defs.' MSJ, Ex. A (copy of D.C. Circuit mandate and July 22, 2003 Order).  Nonetheless, because the March 21, 2003 Order is electronically available on the public docket, the Court was able to review the order for itself.

In addition, the Court notes that Defendants have also cited to"transcripts of the *Campbell* proceedings" in support of their argument that issue preclusion applies in this case, but did not actually provide such material to the Court.  *See* Defs.' MSJ at 21.  Similarly, Defendants cited to various docket entries in the *Campbell* litigation, but failed to actually attach the cited material to their motion.  *See id.* at 13.  The Court was able to review the cited filings in the *Campbell* case only because Plaintiff—rather than Defendants—provided the Court with copies of the cited material.  Defendants, as the party proponents, have the burden of demonstrating that the doctrine of issue preclusion applies, and that includes providing the Court with all relevant cited material; Defendants' failure to do so is inexcusable.

the parties' briefing filed in *Campbell/Inmates of Jail* with respect to the March 21, 2003 Order. *See* Pl.'s Opp'n, Ex. 3 (The Special Officer's Report on Issues Related to Environmental Conditions at the D.C. Jail, March 7, 2003); Ex. 4 (Mem. in Opp'n to Defs.' Mot. to Terminate); Ex. 5 (Mem. in Support of D.C.'s Mot. to Terminate Population Limitation); Ex. 6 (Mem. in Support of D.C.'s Mot. to Terminate). As becomes apparent upon review of that briefing, Judge Bryant's decision, as set forth in the March 21, 2003 Order, related only to environmental conditions in the Jail, such as bed space, temperature control and ventilation, clothing requests, maintenance repairs, issuance of basic supplies, clothing and linen exchange, sanitation and housekeeping issues, etc. *See generally* Pl.'s Opp'n, Ex. 3 (The Special Officer's Report on Issues Related to Environmental Conditions at the D.C. Jail, March 7, 2003); Ex. 4 (Memorandum of Points and Authorities in Opposition to Defendants' Motion to Terminate) at 5; Ex. 6 (Mem. in Support of D.C.'s Mot. to Terminate) at 5-17. These issues are, quite obviously, not the same basic issues raised by Plaintiff in the instant litigation.

Moreover, contrary to Defendants' assertions, the precise issues now raised by Plaintiff in the instant litigation were given little, if any, attention by the parties in their briefing submitted with respect to the March 21, 2003 Order. Indeed, the only mention in either the parties' briefing or the Court's March 21, 2003 Order of inmate-on-inmate violence is a brief one paragraph summary in the District's briefing submitted to Judge Bryant, which includes a mere sentence noting that in December of 2002 "two inmates were murdered in unrelated assaults and a third inmate was stabbed in another unrelated incident." *See* Pl.'s Opp'n, Ex. 6 (Mem. in Support of D.C.'s Mot.n to Terminate) at 9.

In addition, although, as discussed above, certain issues—such as overcrowding at the

Jail—appear to have been raised in the course of the *Campbell/Inmates of Jail* litigation, these matters were not at issue in the March 21, 2003 Order.  For example, although Judge Bryant had imposed a population limitation in July 1985 to address the problem of overcrowding, the population cap was subsequently terminated in June of 2002, well before the December 2002 incidents that are the focus of Plaintiff's suit; issues relating to overcrowding and the imposed population cap were thus resolved before Gaither's death and before the March 21, 2003 Order Defendants now rely upon.  *See* Defs.' Stmt. ¶ 2.

Ultimately, the Court finds that Defendants have failed to demonstrate that the particular issues raised by Plaintiff in the instant lawsuit regarding alleged overcrowded conditions and inadequate staffing, training and supervision, as well as deficiencies in security policies and practices that existed in December of 2002, were raised in or decided by Judge Bryant in his March 21, 2003 Order.  The mere fact that this case and the *Campbell/Inmates of D.C. Jail* matters both involve, at the most general level, allegations of unconstitutional violations does not support a finding that issue preclusion bars Plaintiff's Section 1983 claim.  Although Defendants appear to believe that the March 21, 2003 Order should be read to preclude any inmate who was incarcerated prior March 21, 2003 from litigating any allegations of constitutional violations at the Jail, the Court is not so persuaded.  Accordingly, the Court concludes that the application of the doctrine of issue preclusion is inappropriate in this case.  Defendants' motion for summary judgment is therefore DENIED with respect to their res judicata claims.

      B.    *Plaintiff's Claims Against the Defendant Officials in their Official Capacity are Redundant*

Defendants next contend that Plaintiff's claims (both her Section 1983 claim as well as

her negligence-based claims) against the Defendant Officials in their official capacity—as

opposed to their individual capacities—are redundant of the Plaintiff's claims against the District

and therefore cannot be maintained.  Defs.' MSJ at 23-24.  As Defendants correctly observe,

"[a]n official capacity suit 'is not a suit against the official personally, for the real party in

interest is the entity.'"  *Robinson v. D.C.*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005).  "This Circuit

has recognized that '[a] section 1983 suit for damages against municipal officials in their official

capacities is . . . equivalent to a suit against the municipality itself.'"  *Id.* (quoting *Atchinson v.

D.C.*, 73 F.3d 418, 424 (D.C. Cir.1996)).  "Likewise, 'a tort action brought against city officials

in their official capacities is equivalent to an action against the city itself.'"  *Id.* (quoting *Barnes

v. D.C.*, Civ. No. 03-2547, 2005 WL 1241132, at *3 (D.D.C. May 24, 2005)).  "Accordingly, 'a

plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the

government entity itself.'"  *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

In light of this reality, district courts in this Circuit routinely dismiss claims brought

against District officials in their official capacities where such claims are duplicative of claims

brought against the District itself.

> Although neither the Supreme Court nor the District of Columbia Circuit have held
> that government officials sued in their official capacities in conjunction with suits
> also filed against the municipality should be summarily dismissed, this is the
> overwhelming approach that has been taken by members of this Court, as well as the
> position taken by other courts. This approach is based on the theory that retaining the
> official as a named defendant is a "redundant and an inefficient use of judicial
> resources."

*Price v. D.C.*, 545 F. Supp. 2d 89, 94 (D.D.C. 2008) (quoting *Chisholm v. Superior Court of

D.C.*, No. 06-2174, 2007 WL 1601718, at *2 (D.D.C. June 4, 2007)) (collecting cases).  Pursuant

to this approach, courts consistently dismiss as duplicative both Section 1983 and tort claims

20

asserted against District officials in their official capacity.  *See, e.g., Hardy v. D.C.*, 601 F. Supp.

2d 182, 186-87 (D.D.C. 2009) ("Because plaintiffs make the same claims against the District of

Columbia, the same claims against [former Director of D.C. Department of Corrections] and

[former Jail Warden] in their official capacities are redundant and will be dismissed."); *Price*,

545 F. Supp. 2d at 94-96 (dismissing Section 1983 and negligence claims against District

officials as "not only redundant but also unnecessary when the municipality is also a named

defendant"); *Cotton v. D.C.*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006) (dismissing tort claims

against District officials as "duplicative" where plaintiff also named D.C. as defendant and D.C.

had filed an answer to plaintiff's complaint); *Robinson*, 403 F. Supp. 2d at 49 (dismissing

plaintiff's Section 1983 and Survival Act claims against Chief of the MPD in his official capacity

as "clearly duplicative of her claims against the District itself").

Plaintiff nonetheless objects, arguing that "untimely dismissal [of Plaintiff's claims]

would otherwise work an injustice to limit Plaintiff's ability to choose how she presents her

claims to a jury."  Pl.'s Opp'n at 21.  Plaintiff, however, has not directed the Court to any legal

authority in support of her position, and the Court is not so persuaded.  As her official-capacity

claims against the Defendant Officials merge into her claims against the District, Plaintiff suffers

no prejudice from dismissal of these claims, and, as demonstrated above, the weight of the case

law in this district counsels in favor of dismissing the redundant claims at this stage in the

litigation.  Accordingly, the Court GRANTS Defendants' motion to the extent they seek

dismissal of Plaintiff's claims against the Defendant Officials in their official capacities.

C.      *Plaintiff's Section 1983 Claim Against the District Survives Summary Judgment*

As explained above, Plaintiff's Second Amended Complaint asserts a claim pursuant to

Section 1983 for violation of Gaither's Fifth Amendment rights against the District, alleging that the District is liable for the Defendant Officials' actions (or lack thereof).[9]  According to Plaintiff, the Defendant Officials subjected Gaither to a "serious and unreasonable risk of violent injury as a result of the unconstitutional conditions at the Jail that were well-known to the defendant officials," including "pervasive violence; overcrowding; a shortage of necessary correctional officers; inadequate training of correctional officers; negligent supervision of correctional officers; inadequate policies, procedures, and practices for critical staffing, classification, and security; and failure to enforce such policies, procedures, and practices relating to critical staffing and security that were in effect."  Sec. Am. Compl. ¶ 63.  Plaintiff asserts that the Defendant Officials' "ongoing failure to address these unconstitutionally dangerous conditions" violated Gaither's Fifth Amendment rights.  *Id.* ¶¶ 64-66.  Defendants have moved for summary judgment on this claim, arguing that the Plaintiff cannot establish municipal liability against the District as required under Section 1983.  Defs.' MSJ at 24-29.  Defendants, in so moving, have organized their arguments around four general topics based upon Plaintiff's allegations in her complaint—namely, classification, staffing, security and training/supervision. Accordingly, in addressing Defendants' arguments, the Court shall do the same.

Before doing so, however, the Court first pauses to review the relevant legal standards implicated by Plaintiff's Section 1983 claim against the District—a task which neither party has attempted.  Indeed, the parties have both largely failed to provide any discussion of the legal

---

[9] The Court notes that Plaintiff alleges only that the District is liable for the Defendant Officials' conduct under Section 1983.  *See* Sec. Am. Compl. ¶ 68.  Plaintiff makes no similar allegation that the District is also liable for the conduct of the Defendant Correctional Officers under Section 1983.  *See generally id.* ¶¶ 69-71.

framework necessary for resolution of Plaintiff's claims.  As a result, the briefs submitted by the parties focus almost entirely on factual allegations in a manner wholly divorced from the relevant legal standards. One glaring consequence of the poor quality of the parties' briefing is the failure to properly establish the appropriate constitutional standards that apply in this case, a question to which the Court now turns.

Section 1983 allows a plaintiff to seek monetary damages from government officials who have violated his or her constitutional rights.  *See* 42 U.S.C. § 1983.  A municipality, such as the District, is also subject to suit under Section 1983, but its liability is limited only to circumstances "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 694 (1978)).  In this case, Plaintiff has brought a Section 1983 claim based on allegations that conditions at the Jail violated Gaither's constitutional rights—and more specifically, his Fifth Amendment rights.  Significantly, however, although it is undisputed that the United States Constitution imposes certain obligations on prison officials to ensure the health and safety of incarcerated individuals, whether that right is guaranteed under the Fifth Amendment (as Plaintiff alleges) or under the Eighth Amendment depends upon the status of the incarcerated individual—a point that neither party has addressed.

It is well established that the Eighth Amendment's prohibition on "cruel and unusual punishment" imposes various obligations upon prison officials, including as is relevant to the case at hand, a "duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (internal quotation marks omitted).  It is equally well settled, however, that the "[Eighth] Amendment's prohibition applies only to persons who

are subject to 'punishment," which excludes "pretrial detainees . . . who have not been adjudicated as guilty of any crime and are therefore not subject to 'punishment.'" *Powers-Bunce v. D.C.*, 479 F. Supp. 2d 146, 153 (D.D.C. 2007). Accordingly, courts have recognized that pretrial detainees have an independent due-process right under the Fifth and Fourteenth Amendments[10] to humane conditions while incarcerated. *Hardy v. D.C.*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009). Although the exact contours of a pretrial detainee's right under the Fifth Amendment have not yet been established, it is clear that the Eighth Amendment provides a pretrial detainee "*at least as great* as the analogous Eighth Amendment right." *Id.* (internal quotations marks omitted) (emphasis in original). Thus, although the rights under the Fifth and Eighth Amendments are comparable, it appears that the Fifth Amendment may provide a greater degree of protection to pretrial detainees who are not yet subject to punishment of any kind.

Accordingly, whether an individual is a pretrial detainee is constitutionally-significant. But, as discussed above, *see supra* at pp. 4-5, the parties have not actually briefed the issue. The question therefore remains: is Gaither—as an individual who had already pled guilty, but had not yet been sentenced—a pretrial detainee, whose rights are guaranteed under the Fifth Amendment, or is he a convicted inmate, whose rights are guaranteed under the Eighth Amendment.[11] The majority of courts that have considered this question have held that an individual who has been

---

[10] Individuals suing the District for constitutional due process violations must do so under the Fifth Amendment, and not the Fourteenth, as the District—which is not a state—is subject to the Due Process Clause of the Fifth Amendment. *See Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (citing *Butera v. D.C.*, 235 F.3d 637, 645 n. 7 (D.C. Cir. 1987)).

[11] On this point, the Court notes that, although the Second Amended Complaint nominally characterizes Gaither as "pretrial detainee," this label likely reflects only the Jail's policy of classifying all non-sentenced inmates as pretrial detainees—and does not appear to reflect whether Gaither is a "pretrial detainee" for purposes of the Fifth Amendment.

convicted and/or pled guilty is ***not*** a pretrial detainee for purposes of the Fifth Amendment?[12]  It appears from the Court's own brief research that this is an open question in this Circuit, although case law suggests that the D.C. Circuit would follow the majority approach.  *See Campbell v. McGruder*, 580 F.2d 521, 527 (D.C. Cir. 1978) ("pretrial detainees . . . are presumed innocent. They are *unconvicted* of any crime.") (emphasis added).  Quite clearly, if the Court were to find that an individual who has pled guilty but has not yet been sentenced should be treated as a convicted inmate, rather than a pretrial detainee, for constitutional purposes of evaluating a failure-to-protect claim, Plaintiff's allegations that the Defendants violated Gaither's *Fifth* Amendment rights are, to say the least, on shaky ground.

Nonetheless, the Court need not—and indeed, shall not—resolve this question on the inadequate record now before it.  As an initial matter, although the Fifth Amendment may offer greater protection than the Eighth Amendment, courts have generally employed the same standard of "deliberate indifference" to measure whether prison officials have violated an individual's right to humane conditions under either the Fifth or Eighth Amendment.  *See, e.g., Hardy*, 601 F. Supp. 2d at 189 ("Because a pretrial detainee's rights under the Fifth Amendment are at least as great as those afforded to a convicted prisoner under the Eighth Amendment,

---

[12] *See Tilmon v. Prator*, 368 F.3d 521 (5th Cir. 2004) ("We hold that a prisoner who has been convicted but has not yet been sentenced has the same status as a sentenced prisoner for purposes of purposes of analyzing whether the prison has a liberty interest in certain procedural protections. . . ."); *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished, and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced."); *but see Fuentes v. Wagner*, 206 F.3d 335, 341 (3rd Cir. 2000) ("When Fuentes was placed in the restraint chair he was a convicted inmate awaiting sentencing.  His status under the Constitution was therefore that of a pretrial detainee.").

applying the Eighth Amendment 'deliberate indifference' standard to measure whether the

plaintiffs have alleged a violation of their clearly established Fifth Amendment rights is

appropriate.").  Moreover, as presented by the parties, Defendants' motion for summary

judgment turns, not on questions of law, but on questions of fact.  Defendants have primarily

argued that they are entitled to summary judgment because "[P]laintiff cannot show deficiencies

in the District's customs, policies, and/or practices."  Defs.' MSJ at 28.[13]  The Court concludes

---

[13] In addition to the arguments discussed below, Defendants also allege in passing that
even assuming"[P]laintiff can show deficiencies in the District's customs, policies, and/or
practices," the District is nonetheless entitled to summary judgment on Plaintiff's Section 1983
claim in its entirety because "there is insufficient evidence in the record to establish that the
District's asserted failures proximately caused Mikal Gaither's death."  Defs.' MSJ at 28-29.
According to Defendants, because Gaither "failed to notify the District defendants that he had
provided testimony to the grand jury," the "District had no way of knowing of any potential risk
of harm that Gaither's assailant posed."  *Id.* at 29.  First, to the extent this argument is premised
on an allegation that Gaither should have notified the Jail of his grand jury testimony, this
argument is, in essence, based on the same allegations that underlie Defendants' argument that
Plaintiff's claims are barred by the affirmative defenses of contributory negligence and/or
assumption of the risk.  For the reasons discussed below, material factual disputes preclude
summary judgment on these asserted defenses.  *See infra* at pp. 52-60.  Second, to the extent
Defendants argue more generally that Plaintiff has failed to show that Defendants' conduct
proximately caused Gaither's death, the Court declines to consider this argument.  Defendants
failed to provide any factual or legal citations in support of this assertion, dedicating less than a
paragraph to this argument in their motion for summary judgment and ignoring it altogether in
their Reply.  *See id.* at 28-29.  In light of this cursory treatment, the Court is not in a position to
consider Defendants' argument on this point.  *See also Smith*, 413 F.3d at 103 ("'the proximate
cause of an injury is ordinarily a question for the jury.'") (quoting *Hicks v. United States*, 511
F.2d 407, 420 (D.C. Cir. 1975)).

The Court also notes that Defendants have raised a new arguments for the first time in
their Reply—namely, that they are entitled to summary judgment on Plaintiff's Section 1983
claim because of the absence of inmate violence in NE-3 prior to December 14, 2002.  *See* Defs.'
Reply at 35.  The Court, however, shall not consider this argument raised for the first time in
reply.  *See, e.g., Am. Wildlands v. Kempthorne,* No. 07-5179, 2008 WL 2651091, at *8 (D.C. Cir.
July 8, 2008) ("We need not consider this argument because plaintiffs . . . raised it for the first
time in their reply brief."); *McBride v. Merrell Dow & Pharm.,* 800 F.2d 1208, 1211 (D.C.
Cir.1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only
unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the

that factual disputes preclude Defendants' motion for summary.  Accordingly, because it is

apparent that genuine disputes of material fact exist regardless of the appropriate legal standard

to be applied in this case, the Court finds that—based solely on the arguments

presented—Defendants are not entitled to summary judgment on Plaintiff's Section 1983 claim.

> 1.    Plaintiff's Allegations that the District's Classification Policies,
>        Procedures and Practices were Inadequate Survive Summary Judgment

As explained above, Plaintiff's Section 1983 claim against the District is based, in part,

on allegations that the Defendant Officials failed to address certain unconstitutional conditions,

including "inadequate policies, procedures, and practices for . . . classification."  Sec. Am.

Compl. ¶ 63.  More specifically, Plaintiff alleges that the Defendant Officials failed to implement

"an effective inmate classification system and to evaluate and assign safe housing and

supervision" to inmates.  *Id.* ¶ 30; *see also id.* ¶ 31.  Defendants contend that they are entitled to

summary judgment as to these allegations because there is no evidence that Gaither himself was

improperly classified.  Defs.' MSJ at 26-27.  Plaintiff has opposed Defendants' motion, asserting

that existing factual disputes preclude summary judgment.  Pl.'s Opp'n at 11.  Upon

consideration of the record evidence submitted by the parties, the Court agrees with Plaintiff that

disputed issues of material fact render summary judgment inappropriate.

The relevant facts in the record related to the issue of classification are as follows.  Upon

admission to the Jail in December of 2002, Gaither was classified as Pretrial/General Population.

Defs.' Stmt. ¶ 17.  Although there is no evidence in the record as to what specific classification

Gaither was given at that time—*i.e.*, whether Gaither was classified at the "minimum,"

---

legal issues tendered.") (internal citation omitted).

"medium," or "maximum" security level—the parties agree that Gaither had never been charged

with, or convicted of, a violent crime and had no history of violence in the Jail.  *See* Pl.'s Resp.

¶¶ 36, 37.  Nonetheless, on December 14, 2002, Gaither was assigned to the NE-3 cellblock,

which at that time housed together both inmates classified as Maximum as well as inmates

classified as Pre-Trial Minimum and Minimum.  Pl.'s Resp. ¶¶ 36, 45.

  Plaintiff has introduced testimony from two expert penologists that this practice, as well

as the Jail's classification system in general, was inadequate.  For example, Plaintiff's expert E.

Eugene Miller has opined that "the Jail's approach to classification at the time of Gaither's

murder did not comply with generally accepted practices in the field," and that, had the Jail

implemented the recommended changes to its classification system (as referenced in Plaintiff's

Second Amended Complaint), "Gaither—with no convictions for violent crimes and no

institutional history of violent behavior—would not have been housed with predatory inmates

with violent convictions and/or violent institutional histories."  Pl.'s Opp'n, Ex. 8 (Expert Report

of E. Eugene Miller) (hereinafter, "Miller Report") at 10.  Similarly, Plaintiff's expert James E.

Aiken has opined that "Gaither should have been separate (*i.e.*, assigned to a different cellblock)

from violent inmates," and that the "absence of a system for separating predatory inmates from

non-disruptive inmates created an unsafe environment for many inmates, including Gaither."

Pl.'s Opp'n, Ex. 20 (Expert Report of James E. Aiken) (hereinafter "Aiken Report") at 19-20.

Defendants, in filing for summary judgment, have not provided any expert testimony to rebut

these conclusions.

  Despite the above evidence, Defendants have moved for summary judgment, arguing that

Plaintiff cannot establish that "Mikal Gaither was improperly classified when he was housed with

murderers." Defs.' MSJ at 26. Defendants' argument is not well taken. As demonstrated above, Plaintiff has introduced expert testimony supporting her position that the Jail's classification system was inadequate and that Gaither was inappropriately housed in the same cellblock as violent offenders. Although Defendants contend that Plaintiff's experts "have failed to support those allegations," Defendants' argument on this point is based upon a mischaracterization of the expert's deposition testimony. *See id.* Defendants appear to concede as much as they have failed to respond in their Reply to Plaintiff's assertion, as set forth in her opposition, that Defendants have misstated the record evidence. *See generally* Defs.' Reply. Indeed, Defendants' Reply is silent as to Plaintiff's Section 1983 claim against the District based upon alleged deficiencies in the Jail's classification system. Accordingly, based on the record above, the Court finds that genuine issues of disputed material fact preclude summary judgment and therefore DENIES Defendants' motion with respect to Plaintiff's allegations that the District failed to implement an adequate classification system.

2.    Plaintiff's Allegations that the District's Staffing Policies, Procedures and Practices were Inadequate Survive Summary Judgment

In support of her Section 1983 claim against the District, Plaintiff has also alleged that the Defendant Officials failed to address the "shortage of necessary correctional officers" at the Jail as well as the Jail's "inadequate policies, procedures, and practices for critical staffing," and also "fail[ed] to enforce such policies, procedures and practices relating to critical staffing . . . as were in effect." Sec. Am. Compl. ¶ 63. Defendants move for summary judgment on these allegations, arguing that "[t]here is [] no evidence in this record that the District's staffing levels did not satisfy the demand standard required." Defs.' MSJ at 27. According to Defendants, the Jail's

staffing policy in effect in December of 2002 required only "that two officers be present at all times," and, because it is undisputed that "two officers were present when the stabbing occurred," Plaintiff's allegations with respect to staffing must fail. *Id.* at 28. Defendants' argument is thus predicated entirely on the factual premise that the critical staffing complement[14] for the NE-3 cellblock, effective in December of 2002, was two correctional officers. *See, e.g.,* Defs.' Reply at 30-34 (arguing that "Defendants are entitled to summary judgment on Plaintiff's constitutional claims concerning staffing because the undisputed evidence establishes that the Jail did not routinely fall below the critical staffing minimum for NE-3"). In response, Plaintiff argues that the critical staffing complement for the NE-3 cellblock in December of 2002 was in fact three—not two—correctional officers. Pl.'s Opp'n at 17. The evidence on this issue is contradictory.

For example, Plaintiff has submitted a declaration by Defendant Washington that was previously filed in 2002 as part of a separate civil action, *Fraternal Order of Police/Dep't of Corr. Labor Comm. v. Williams*, Civ. Act. No. 02-461. Pl.'s Opp'n, Ex. 16 (Declaration of Odie Washington) (hereinafter "March 2002 Washington Decl."). Attached to the March 2002 Washington Declaration is the then-current "Critical Staffing Complement," which states that the critical staffing complement for the NE-3 cellblock for all shifts at that time was two correctional officers. *See id.* ¶ 6 & pp. 5-7. Although the March 2002 Washington Declaration itself is undated, it is apparent from the face of the document that it was originally filed in the *Williams* matter on March 25, 2002. *See generally id.* The March 2002 Washington Declaration and its

---

[14] The critical staffing complement is the number of correctional officers that must be in a unit at all times. *See* Pl.'s Opp'n, Ex. 11 (Deposition Excerpt of Marvin Brown) at 93:9-22; 121:19-122:3; *see also id.*, Ex. 22 (Deposition Excerpt of Pamela Chase) at 118:9-17.

attachments therefore support a finding that, at least as of March 25, 2002, the critical staffing

complement for NE-3 was only two correctional officers.[15]

By contrast, Plaintiff has also submitted excerpts of the deposition of Defendant Brown,

who was Warden of the Jail in December of 2002, that was taken on October 4, 2007, as part of

the litigation in *Beale v. D.C.*, Civ. Act. No. 04-959.  *See* Pl.'s Opp'n, Ex. 11 (Deposition

Excerpt of Marvin Brown).  In the excerpted testimony, Brown is referred back to an exhibit that

had previously been entered on the record in the deposition and that is described in the transcript

as "Odie Washington's declaration."  *Id.* at 121:2-7.  Brown was asked to review the exhibit, and

to testify as to the substance of the document.  *Id.* at 121:2-12.  According to the deposition

excerpt, Brown testified that the exhibit described the critical staffing complement for NE-3 as

three correctional officers.  *Id.*  From this Plaintiff concludes that the critical staffing complement

---

[15] Plaintiff argues that, to the contrary, the March 2002 Washington Declaration should be read to state that the critical staffing complement in NE-3 was three correctional officers, not two.  In so arguing, Plaintiff focuses on language in the declaration that states that "[c]ellblocks that are double-celled will be staffed with 3 officers on the day and evening shifts."  *See* Pl.'s Opp'n at 17 & n.7.  Plaintiff argues that, because NE-3 was a double-celled cellblock, this language demonstrates that the critical staffing complement for NE-3 was three correctional officers, not two; to the extent the attached "Critical Staffing Complement" contradicts this quoted statement, Plaintiff simply contends the attachment should be disregarded as inconsistent. *See* Pl.'s Resp. ¶ 29 & p. 16, n. 4.  As Defendants point out, however, Plaintiff's argument ignores the distinction between the number of correctional officers that may be staffed on a particular cellblock on a particular shift and the "critical staffing complement"—*i.e.,* the absolute *minimum* number of correctional officers that must be assigned to a cellblock for a particular shift.  *See* Defs.' Reply at 31-32; *see also id.*, Ex. 6 (Deposition Excerpt of Stephen Minus) at 107:4-19; 109:10-21.  Accordingly, the statement that double-celled cellblocks, such as NE-3, would be staffed with three correctional officers does not necessarily contradict the statement that the critical staffing complement for NE-3 was only two correctional officers.  Regardless, as explained above, the March 2002 Washington Declaration provides evidence only as to the critical staffing complement that was in effect in March of 2002, and, absent indication that the numbers remained the same in December of 2002, does not definitely resolve the critical staffing complement that was in effect during the time period relevant to the instant litigation.

at the time of Gaither's attack was three correctional officers.  *See* Pl.'s Resp. ¶ 46.  Brown's

excerpted testimony, however, does not definitively demonstrate that the critical staffing

complement in *December of 2002* was three correctional officers as it is entirely unclear from the

deposition excerpt what precise time period Brown is referring to when he states that the critical

staffing complement was three correctional officers.  *See id.*  Plaintiff has not provided the Court

with any evidence clarifying the specific time frame referred to in the deposition nor has Plaintiff

submitted a copy of the declaration Brown referred to in the deposition, which may have shed

light on this issue.[16]  Although the deposition excerpt was taken during discovery for the *Beale*

matter, which also focused on the same time period in December 2002 that is in issue in this

case, Plaintiff has not directed the Court to any evidence conclusively demonstrating that the

testimony was in fact referring to the critical staffing complement in place in December of 2002

and not, for example, the policy in place at the time of the deposition itself.  Accordingly, the

Court cannot conclude that the cited testimony accurately describes the policy in place during the

---

[16] Defendants have assumed that the declaration referred to in this deposition excerpt is
the same March 2002 Washington Declaration discussed above and therefore argue that Brown's
testimony does not create an issue of disputed fact because it is based on a misreading of the
March 2002 Washington Declaration, which clearly provides that the critical staffing
complement is three correctional officers.  *See* Defs.' Reply at 33.  On the record now before it,
however, the Court has no means of confirming whether the "Odie Washington declaration"
referred to in the October 4, 2007 Brown deposition is the same March 2002 Washington
Declaration filed in *Fraternal Order of Police*.  Neither party has attached a copy of the exhibit
used in the October 4, 2007 Deposition, and it is unclear from the deposition excerpt itself
whether Brown is referring to the March 2002 Washington Declaration.  One possible
explanation for the apparent contradiction is that Washington authored a second declaration for
the *Beale* litigation, which—unlike the March 2002 Washington Declaration—states that the
critical staffing complement for NE-3 was three correctional officers.  That is, it may be that the
critical staffing complement for NE-3 Unit was two correctional officers in March of 2002, but
subsequently changed to three correctional officers at some undisclosed date.  Any such
conclusion, however, is speculative at this point, given the lack of evidence in the record.

relevant time period.

Ultimately, then, the Court is not in a position to determine what the specific critical

staffing complement was in December of 2002.  Because Defendants' arguments in favor of

summary judgment on this issue are premised on a finding that the critical staffing complement

in effect at the time of Gaither's stabbing was only two correctional officers—a fact which

remains in dispute—summary judgment is inappropriate at this time.[17]  Accordingly, the Court

shall DENY Defendants' motion for summary with respect to Plaintiff's allegations of

inadequate staffing.

<u>3.</u>        <u>Plaintiff's Allegations that the District's Security Policies, Procedures and
Practices were Inadequate Survive Summary Judgment</u>

In support of her Section 1983 claim against the District, Plaintiff alleges that the

Defendant Officials failed to address the Jail's "inadequate policies, procedures, and practices for

. . . security" and also "fail[ed] to enforce such policies, procedures and practices relating to . . .

security as were in effect."  Sec. Am. Compl. ¶ 63.  More specifically, the alleged

"[i]nadequacies in security at the Jail included the failures to control contraband; to install metal

detectors and necessary security cameras; to control movement of inmates within the Jail; and to

conduct and document reasonably frequent and unannounced housing unit, inmate, and cell

---

[17] Moreover, the Court notes that even if the critical staffing complement in NE-3 in effect on December 14, 2002 was for two correctional officers, as Defendants contend, Plaintiff has presented expert testimony—unrebutted by Defendants—that such a policy would have itself been deficient. *See* Miller Rep. at 7 ("In my opinion, having three (3) officers on duty *at all times* during the second and third shifts in the Northeast Three cellblock was the absolute bar minimum staffing required to provide even a hope of adequate protection from harm.") (emphasis added).  Thus, even assuming the Court were to find that Defendants' policy in effect in December of 2002 required only two correctional officers be present in NE-3 at all times, Defendants would not necessarily be entitled to summary judgment on allegations that the District's staffing policies, procedures, and practices were inadequate.

shakedowns." *Id.* ¶ 35.  Defendants have moved for summary judgment solely on the allegation

in Plaintiff's Second Amended Complaint that the Defendant Officials failed to ensure that

reasonably frequent and unannounced housing unit, inmate, and cell shakedowns were conducted

and documented, arguing that Plaintiff cannot establish any deficiencies in the Jail's shakedown

policies or practices.  *See* Defs.' MSJ at 27; Defs.' Reply at 21-26.[18]  Plaintiff opposes

Defendants' motion, arguing that material issues of disputed fact preclude summary judgment.

The facts relevant to this issue are as follows.  Defendants contend that it was the Jail's

policy and practice in December of 2002 to require correctional officers to: (1) search inmates for

weapons every time they entered or exited the NE-3 cellblock and to record those searches in

which an item of contraband was located, *see* Defs.' Stmt. ¶ 20; Defs.' MSJ, Ex. E (Deposition

Excerpt of Gary Brinson) at 150:13-151:11; (2) conduct 5 random shakedowns of 5 different

cells in each housing unit each shift and make a written record of each of these random

shakedowns, *see* Defs.' Stmt. ¶ 22; Defs.' MSJ, Ex. E (Deposition Excerpt of Gary Brinson) at

155:1-156:11; (3) shakedown an entire housing unit each day, and record the shakedowns in the

daily shift logs, *see* Defs.' Stmt. ¶ 23; Defs.' MSJ, Ex. E (Deposition Excerpt of Gary Brinson) at

163:1-165:16; and (4) conduct mass shakedowns of the entire Jail on a quarterly basis, and make

a written record of these shakedowns as well, *see* Defs.' Stmt. ¶ 23; Defs.' MSJ, Ex. E

(Deposition Excerpt of Gary Brinson) at 169:1-7.

Plaintiff does not dispute that this accurately describes the policy in effect at the time of

Gaither's stabbing nor does Plaintiff appear to dispute that the policy as written is adequate.

---

[18] Defendants have not moved for summary judgment as to any of Plaintiff's remaining allegations with respect to the District's security policies, procedures and practices that underlie Plaintiff's Section 1983 claim.  *See generally* Defs.' MSJ at 24-29.

Rather, Plaintiff asserts that the policy was not actually followed. *See generally* Pl.'s Opp'n at 10; Pl.'s Resp. ¶¶ 21-24.  As Plaintiff emphasizes, the Jail's own policy required shakedowns of cells, housing units and the Jail as a whole to be recorded, *see supra* at p. 34, but Defendants' records produced to Plaintiff during discovery do not support Defendants' assertion that the required shakedowns were conducted and documented. *See id.* ¶¶ 21-24.  As support for this assertion, Plaintiff intends to introduce at trial the testimony of her expert penologists that Jail employees were required to document all shakedowns and to retain those documents for five years,[19] but that no such records were produced, thereby impeaching Defendants' claim that the shakedowns had in fact occurred and been documented. *See* Aiken Rep. at 14-15; Miller Rep. at 11.

In response, Defendants attached various records and documents to their Reply, which they assert demonstrate that—contrary to Plaintiff's claims—the Jail's policy of conducting and documenting frequent, unannounced shakedowns was followed in practice.  *See* Pl.'s Reply at 23-24 & Ex. 3 (Log Book Entries for NE-3) & Ex. 4 (Contraband Reports from June 14, 2002; July 15, 2002; August 15, 2002; August 20, 2002; September 13, 2002; October 15, 2002; and November 15, 2002).  It does not appear, however, that these materials were actually produced to

---

[19] Defendants dispute that the Jail's policy required the records be retained for five years, arguing instead that the shakedown records were typically retained for only 30 days. *See* Defs.' Reply at 25.  In support of this claim, Defendants rely on the deposition testimony of Brinson, in which he states that he "would assume they would keep a copy of that [shakedown] sheet for 30 days at least." *See id.*, Ex. 5 (Deposition Excerpt of Gary Brinson) at 167:11-13; *see also id.* at 160:8-11 ("Q.  During your tenure as major of operations, can you tell me how long the shakedown sheets were kept.  A.  No.  My man would take them for 30 days.  Keep a copy for 30 days.").  Brinson's recollection that shakedown records were kept at least 30 days does not, however, directly refute Plaintiff's assertion that the Jail's policy required such records be retained for five years.

Plaintiff as part of this litigation, given that the documents are either labeled as having been produced in the *Beale* litigation or contain no bates-label at all.  The reasonable inference, then, is that Plaintiff's experts also did not have access to these documents when they reviewed the documents produced in this litigation and formed the opinions discussed above.

Ultimately, given the unsettled record now before the Court and Defendants' late-presentation of records that do not appear to have been produced to or reviewed by Plaintiff's experts, the Court declines to grant summary judgment to Defendants.  At a minimum, Plaintiff's experts should be permitted to review the newly-submitted records to determine whether the existence of such records alters their opinions in this case.  Accordingly, the Court shall DENY Defendants' motion for summary judgment with respect to Plaintiff's allegations in support of her Section 1983 claim that the Defendant Officials failed to ensure that reasonably frequent and unannounced housing unit, inmate, and cell shakedowns were conducted and documented.

      4.      Plaintiff's Allegation that the Defendant Officials Inadequately Trained the Correctional Officers Survives Summary Judgment

Plaintiff also alleges in support of her Section 1983 claim that the Defendant Officials failed to adequately train the Jail's correctional officers.  Sec. Am. Compl. ¶ 63.[20]  Defendants have moved for summary judgment, arguing that Plaintiff cannot show that the District's correctional officers were inadequately trained.  Defs.' MSJ at 27.  In particular, Defendants contend that Plaintiff has failed to specify any particular deficiency in training—*i.e.*, what specific training the correctional officers were required to, but did not, receive—and that Plaintiff

---

[20] In addition, Plaintiff alleges as part of her Section 1983 claim against the District that the Defendant Officials negligently supervised the correctional officers.  Sec. Am. Compl. ¶ 63. Defendants have not addressed this allegation.  *See generally* Defs.' MSJ at 24-29.

has not demonstrated how the alleged lack of adequate training contributed to Gaither's death. *Id.*; *see also* Defs.' Reply at 26-29.

The relevant facts in the record related to the issue of training are as follows.  Plaintiff asserts, and Defendants do not object, that both generally-accepted practice and national standards require that the Jail's correctional officers annually receive at least 40 hours of in-service training on relevant topics.  Pl.'s Resp. ¶ 50.  Plaintiff has also introduced evidence into the record suggesting that correctional officers did not receive any training in 2002.  *Id.* ¶ 53 ("Q. You say the training area closed at Lorton . . . ?  A.  Yes.  Q.  Where was the training conducted if the facility at Lorton was closed?  A.  It was not.  Q.  So do you recall if officers received training during 2002?  A.  I would have to say no.").  Plaintiff's expert, Miller, has suggested that a failure to train the Defendant Correctional Officers on the proper procedures for obtaining relief contributed to Gaither's death, and has explicitly opined that the failure to train the correctional officers "in the procedure of locking cell doors after the inmates had been let out for recreation . . . directly facilitated the assault in that Gaither's assailants were able to pull him into an open cell and fatally stab him."  Miller Rep. at 12.  Defendants have not offered any evidence to the contrary, other than evidence that Defendants Brooks and Toppin received approximately six weeks of training when they were originally hired and received some sporadic training thereafter.  Defs.' Reply Stmt. ¶¶ 51-53; Defs.' Reply, Ex. 1 (Deposition Excerpt of Zerline Brooks) 121:14-19; 124:10-125:3 (testifying that she received six weeks of training when hired and thereafter received some weapons training and yearly CPR training); Defs.' Reply, Ex. 2 (Deposition Excerpt of Gounod Toppin) at 17:8-20:20 (testifying that he received six weeks of training when hired and thereafter received minimal sporadic training).

Based on this record, the Court finds that Defendants have not shown that they are entitled to summary judgment on Plaintiff's allegations that the Defendant Officials failed to ensure the correctional officers were adequately trained.  As the Supreme Court has observed,

> [i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Here, Plaintiff has introduced evidence—unrebutted by Defendants—that the District failed to provide any training whatsoever to the Jail's correctional officers in 2002.  Moreover, contrary to Defendants' assertion, Plaintiff has identified two specific areas of training that she contends the correctional officers should have received, namely, training on the procedures for obtaining relief and for closing cellblock doors upon the inmates' departure.  Given the duties generally assigned to the Jail's correctional officers to protect the inmates' health and safety, the Court concludes that there is sufficient evidence in the record from which a reasonable jury could find that the Defendant Officials' failure to implement any training program in 2002—including training on security procedures, such as the closing of cellblock doors and obtaining relief to ensure staffing remains adequate at all times—was deliberately indifferent to the safety of Gaither.  Moreover, although the record regarding causation is minimal, the Court is cognizant of the D.C. Circuit's position that "'the proximate cause of an injury is ordinarily a question for the jury.'"  *Smith*, 413 F.3d at 103 (quoting *Hicks v. United States*, 511 F.2d 407, 420 (D.C. Cir. 1975)).  The Court therefore

DENIES Defendants' motion for summary judgment as to Plaintiff's allegation of inadequate training.

> D.      *Genuine Disputes of Material Fact Preclude the Defendant Officials' Claim of Qualified Immunity as to Plaintiff's Section 1983 Claim*

Defendants next argue that the Defendant Officials are entitled to qualified immunity from Plaintiff's Section 1983 claim asserted against them in their personal capacities. Defs.' MSJ at 29-35. Plaintiff has opposed the Defendant Officials' claim of qualified immunity, arguing that (1) the Defendant Officials have waived their right to assert a qualified immunity defense, and (2) even assuming the Defendant Officials did not waive the defense, they are not substantively entitled to qualified immunity in this case. Pl.'s Opp'n at 18-20. For the reasons set forth below, the Court finds that the Defendant Officials did not waive their right to claim qualified immunity, but that genuine disputes of material fact preclude summary judgment on the asserted defense.

> 1.      Legal Standard for Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine is available only to government officials sued in their personal, rather than official, capacity, *see Mitchell v. Forsyth*, 427 U.S. 511, 556, n.10 (1985), and serves as "an immunity from suit rather than a mere defense to liability," *Pearson*, 129 S. Ct. at 815 (quoting *Mitchell*, 472 U.S. at 526). As explained by the Supreme Court, there are two inquiries involved in the qualified immunity

analysis.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  If the first question is answered in the negative, the analysis is over and the officer is entitled to qualified immunity.  *Id.*  If, however, the court determines that there is a constitutional violation, the court must then turn to the second step in the analysis, which asks "whether the right was clearly established."  *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "  *Id.* at 201-02.[21]

> ### 2.    The Defendant Officials Did Not Waive Their Right to Assert Qualified Immunity

Plaintiff first contends that the Defendant Officials waived their right to assert qualified immunity.  Pl.'s Opp'n at 18-19.  Plaintiff argues that all Defendants were required by this Court to address and brief claims of qualified immunity, if any, by no later than September 7, 2008; accordingly, because the Defendant Officials did not file any such motion by September 7, 2008 and instead waited until their motion for summary judgment to assert their claims of qualified immunity, Plaintiff contends that they have waived their right to do so now.  *Id.*  Although Plaintiff correctly notes that qualified immunity is an affirmative defense that may be waived, *see*

---

[21] Pursuant to the Supreme Court's recent decision in *Pearson*, courts now have discretion regarding which of the two prongs of the qualified immunity analysis to address first.  *See Pearson*, 129 S. Ct. at 818.

*Anderson-Bey v. D.C.*, 466 F. Supp. 2d 51, 61 (D.D.C. 2006), the Court does not agree with

Plaintiff's assertion that the Defendant Officials have waived their right to claim qualified

immunity.

Plaintiff's argument relies on the Court's August 7, 2007 Scheduling and Procedures

Order, in which the Court provided that (a) Defendants were to notify the Court by August 21,

2007, if they intended to file a motion to dismiss on the question of qualified immunity and (b) if

they intended to file such a motion, Defendants were required to do so by September 7, 2007.

*See* 8/7/07 Scheduling and Procedures Order, Docket No. [59], at 6 (hereinafter "August 7, 2007

Scheduling Order").  Contrary to Plaintiff's assertions, the Court's August 7, 2007 Scheduling

and Procedure Order required only that, in the event Defendants chose to file a pre-discovery

motion to dismiss on the issue of qualified immunity, they were required to give notice and file

the motion by a date certain.  The August 7, 2007 Scheduling and Procedure Order says nothing

about waiver, and in no way suggests that Defendants would be deemed to have waived their

qualified immunity claims if they decided that it was inappropriate to file a pre-discovery motion

on the issue of qualified immunity.  *See* August 7, 2007 Scheduling Order.  Moreover, as

"[w]aiver is traditionally defined as 'the intentional relinquishment or abandonment of a known

right,'" *Anderson-Bey*, 466 F. Supp. 2d at 61 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464

(1938)), it would be both unreasonable and unfair to hold that Defendant Officials waived any

claim of qualified immunity in this case, given that they pled qualified immunity in their answer

and have now asserted it in their first motion for summary judgment.  Accordingly, the Court

finds that quality immunity defense has not been waived by the Defendant Officials.

41

<u>3.</u>    <u>The Defendant Officials Have Not Shown That They are Entitled to</u>
<u>Qualified Immunity</u>

Having determined that the Defendant Officials did not waive their right to assert

qualified immunity, the Court turns next to the merits of their claim that they are immune from

Plaintiff's Section 1983 claim.  Although Defendants' briefing on this point is less than clear, it

appears that Defendants' arguments are principally directed at the first prong of the two-factor

qualified immunity analysis, which considers whether the facts alleged, taken in the light most

favorable to Plaintiff, show that the Defendant Officials' conduct violated a constitutional right.[22]

That is, Defendants assert that there is "no evidence in this record that defendants Washington,

Brown and/or Harrison operated the Jail with deliberate indifference to or a reckless disregard for

the safety of Gaither."  Defs.' MSJ at 35.

At the outset, the Court notes that, in arguing that qualified immunity applies, Defendants

have apparently assumed that Plaintiff's Section 1983 claim is properly predicated on a claim

that Defendants violated Gaither's Fifth Amendment.  *See id.*  As discussed above, it is not clear

on the record now before the Court whether Plaintiff may in fact assert a predicate constitutional

claim under the Fifth Amendment as opposed to the Eighth Amendment.  *See supra* at pp. 22-25.

However, because Defendants' arguments with respect to qualified immunity principally turn on

questions of fact, rather than issues of law, and because the Fifth and Eighth Amendments both

---

[22] The Court notes that Plaintiff has entirely failed to address this argument by the
Defendant Officials.  *See generally* Pl.'s Opp'n at 19-20.  Indeed, Plaintiff's abbreviated analysis
of Defendants' qualified immunity claim provides little assistance to the Court, as it simply states
that, as a general matter, prisoners have a constitutional right to be protected from violence at the
hands of other inmates.  *See id.*  Nonetheless, it is ultimately the Defendant Officials' burden to
show that they are entitled to qualified immunity, a burden which the Court finds Defendant
Officials have not satisfied, given the existence of disputed issues of material fact.

require a showing of deliberate indifference (although, as explained above, the Fifth Amendment

may provide greater protection), the Court concludes that it may nonetheless consider

Defendants' arguments.

The Defendant Officials first contend that the facts do not support a finding that they

were deliberately indifferent to Gaither's safety because "there is no evidence in this record that

these defendants knew or should have known that Mikal Gaither was at risk to be stabbed by

Matthew Ingram" or that "these defendants [had] notice of Gaither's impending stabbing."

Defs.' MSJ at 31-32.  Accordingly, Defendants conclude that, because government officials "can

only be held liable" under Section 1983 "in those instances when plaintiffs can prove that they

were 'deliberately indifferent' to a known risk of serious harm," Plaintiff cannot show that the

Defendant Officials violated Gaither's constitutional rights.  *Id.* at 31.  Although Defendants are

correct that a plaintiff must show that the government employees were deliberately indifferent in

order to succeed on a failure-to-protect claim under Section 1983, Defendants' argument on this

point nonetheless fails because it is based on a fundamental misunderstanding of Plaintiff's

Section 1983 claim with respect to the Defendant Officials.

Plaintiff does not allege that the Defendant Officials knew or should have known that

Gaither would be stabbed by Ingram on December 14, 2002.  Indeed, Plaintiff has readily

conceded to Defendants' assertion that the Defendants in this case did not have any notice that

there were specific threats made to Gaither and that Gaither never affirmatively sought protective

custody from other inmates.  Pl.'s Resp. ¶ 18.  Rather, the essence of Plaintiff's allegations

against the Defendant Officials is that they failed to address various unconstitutionally dangerous

conditions at the Jail; that this failure was the result of a conscious and deliberate decision or of

reckless disregard for the safety of the inmates at the Jail; and that this deliberate indifference and reckless disregard for the substantial risk of harm to individuals incarcerated at the Jail directly and proximately caused Gaither's injuries and death.  Sec. Am. Compl. ¶¶ 63, 64.  Plaintiff's allegations are *not* based on any assertion that the Defendant Officials were deliberately indifferent to a known risk that Gaither in particular would be specifically attacked by Ingram.

Second, Defendants more broadly contend that the facts do not support a finding that the Defendant Officials were deliberately indifferent to Gaither's safety for the same reasons that form the basis of their arguments against municipal liability under Section 1983—for example, that there is no evidence that "Gaither should not have been placed in the same housing unit with Matthew Ingram," Defs.' MSJ at 31; that the critical staffing complement for NE-3 required only two correctional officers be present at the time of Gaither's stabbing, *id.* at 34; that Plaintiff has failed to "point to any evidence that a systematic training defect caused Mikal Gaither's death," Defs.' Reply at 42; and that Plaintiff failed to show that the Jail's shakedown policy was not actually enforced, *see id.*; *see also* Defs.' MSJ at 34-35.

The Court, however, has already found that genuine disputes of material fact exist, precluding summary judgment with respect to Plaintiff's Section 1983 claim against the District. *See supra* at pp.27-38.  Based on the record now before it, the Court concludes that these disputes equally preclude summary judgment on the Defendant Officials' claims of qualified immunity.  "A defendant's entitlement to qualified immunity is, of course, a pure question of law to be decided by the Court."  *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 20, 22 (D.D.C. 2007).  Where, however, the material facts underlying a defendant's claim of qualified immunity are in dispute, "it is impossible for the court to determine, as a matter of law,

what predicate facts exist to decide whether or not the officer's conduct clearly violated established law." *Id.*; *see also Bolger*, 608 F. Supp. 2d at 22.  In other words, the Court cannot determine at the summary judgment stage whether the challenged conduct would be viewed as lawful by an objectively reasonable officer if the "very facts establishing what that conduct was are legitimately in dispute." *Halcomb*, 526 F. Supp. 2d at 22.  Accordingly, Defendant's motion for summary judgment as to the Defendant Officials' qualified immunity claims is DENIED.

>    E.    *The Defendant Correctional Officers are Entitled to Qualified Immunity as to Plaintiff's Section 1983 Claim*

Defendants also contend that the Defendant Correctional Officers are entitled to qualified immunity with respect to Plaintiff's Section 1983 claim against them in their personal capacities. As explained above, Plaintiff alleges that, shortly before Gaither was stabbed on December 14, 2002, Defendant Brooks "left her post with the acquiescence of the other assigned correctional officers without first arranging for temporary coverage of her post by a relief officer."  Sec. Am. Compl. ¶ 69.  According to Plaintiff, "Defendant correctional officers knew that this act violated the critical staffing requirements for the housing unit and created an unreasonable risk of serious inmate-on-inmate violence."  *Id.*  In addition, Plaintiff alleges that the "defendant correctional officers failed to take necessary steps they could have taken to control activity and movement of the inmates and the presence of weapons in the housing unit."  *Id.*  Plaintiff concludes that this "conduct by the defendant correctional officers was deliberately indifferent to and recklessly disregarded substantial and unreasonable risk of harm to Gaither and proximately caused his injuries and death" in violation of his constitutional rights.  *Id.* ¶ 70.

Although Defendants' briefing on this point is less than a model of clarity, it appears that

the Defendant Correctional Officers principally argue that they are entitled to qualified immunity

because the Plaintiff cannot show that they were "deliberately indifferent" to Gaither's safety, as

is required under Section 1983.  That is, it appears that Defendants' arguments are primarily

directed to the first prong of the two-factor qualified immunity test, arguing that it is not met in

this case—*i.e.*, demonstrating that the facts alleged, taken in the light most favorable to Plaintiff,

do not show that the Defendant Correctional Officers' conduct violated a constitutional right.

Significantly, Plaintiff has *not* opposed the Defendant Correctional Officers' assertion

that they are entitled to qualified immunity.  Indeed, although Plaintiff has opposed the

Defendants Officials' assertions of qualified immunity, Plaintiff's opposition is silent with

respect to the Defendant Correctional Officers' claim of qualified immunity.  *See generally* Pl.'s

Opp'n.  Plaintiff has thus conceded the Defendant Correctional Officers' arguments on this point.

"It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive

motion and addresses only certain arguments raised by the defendant, a court may treat those

arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., General*

*Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd 98 Fed. Appx. 8 (D.C.

Cir.2004); *see also Franklin v. Potter,* 600 F. Supp. 2d 38, 60 (D.D.C. 2009) (treating

defendant's argument in motion for summary judgment as conceded where plaintiff failed to

address it in his response).  Accordingly, because Plaintiff had the opportunity to respond to the

Defendant Correctional Officers' assertion of qualified immunity—and more particularly, their

claim that they were not deliberately indifferent to Gaither's health and safety—but did not do so,

the Court shall construe her failure as a concession with respect to the merits of the Defendant

Correctional Officers' qualified immunity claim.  *See Hopkins*, 284 F. Supp. 2d at 25.  The Court

therefore GRANTS the Defendants' motion insofar as it argues that the Defendant Correctional

Officers are entitled to qualified immunity with respect to Plaintiff's Section 1983 claim.[23]

>   F.      *Plaintiff's Negligence-Based Claims Survive Summary Judgment*

In addition to Plaintiff's Section 1983 claim, she has also asserted two claims based on

allegations that the Defendants were negligent in breaching the duty of care owed to Gaither: (1)

a negligence/survival action against all Defendants (Count Two); and (2) a claim for wrongful

death against all Defendants (Count Three).  With respect to the Defendant Officials, Plaintiff

alleges that they "failed to require reasonably frequent and unannounced housing unit, inmate,

and cell shakedowns; to provide for the installation of install [*sic*] metal detectors and necessary

security cameras; to provide adequate numbers of correctional officers at all times; and to

provide proper training and supervision for correctional officers and other employees."  Sec. Am.

Comp. ¶ 75.  According to Plaintiff, the Defendant Officials "knew or should have known that,

as a result of the absence of these and other necessary and generally accepted prison-security

policies, practices, and resources for which they had responsibility, it was reasonably foreseeable

that [incarcerated individuals] would be attacked and seriously injured by other inmates."  *Id.*

With respect to the Defendant Correctional Officers, Plaintiff alleges that they "knew or should

have known that, as a result of their failure to maintain a level of three correctional officers on

duty at all times during the day and evening shift in Northeast Three housing unit; to control

contraband; and to take practical steps to control and monitor the activity and movement of

---

[23] The Court notes that Defendants raised for the first time in their Reply an assertion that Defendant White is also entitled to summary judgment because "nothing in the record would support a finding of liability" against him.  Defs.' Reply at 43.  Although the Court agrees that the record now before it is sparse with respect to Defendant White, the Court shall not consider an argument raised by Defendants for the first time in their Reply.  *See supra* at pp. 26, n. 13.

inmates when they were permitted to leave their cells, it was reasonably foreseeable that inmates

such as Gaither would be attacked and seriously injured by other inmates." *Id.* ¶ 76.  Finally,

with respect to the District, Plaintiff alleges that D.C. is "vicariously liable under the doctrine of

*respondent superior* for" the alleged negligence of the Defendant Officials and the Defendant

Correctional Officers.  *Id.* ¶ 77.

Defendants have moved for summary judgment on these negligence-based claims.  Their

arguments on this issue generally fall into two categories—first, that Plaintiff has failed to

establish an applicable standard of care, as required to prove negligence, and, second, that

Plaintiff has not shown any deficiencies in the Defendants' policies, procedures, and practices or

conduct that could support a finding of negligence.  Defs.' MSJ at 38-41.  The Court shall

address each argument in turn below.

> 1.    To the Extent Defendants Challenge the Sufficiency of the Plaintiff's
>        Expert Testimony, Defendants' Motion is Denied

First, Defendants argue that Plaintiff has failed to establish the applicable standard of care

necessary to succeed on her negligence-based claims.  "It is well settled under District of

Columbia law that a plaintiff in a negligence action must establish three elements: an applicable

standard of care, a deviation from that standard by the defendant, and injury resulting from that

deviation."  *Scott v. D.C.*, 101 F.3d 748, 757 (D.C. Cir. 1996).  "Failure to prove a standard of

care is thus fatal to a negligence claim."  *Id.*  "Furthermore, where the alleged negligent act is not

'within the realm of common knowledge and everyday experience,' proof of the applicable

standard of care must be established by expert testimony."  *Id.* (quoting *Toy v. D.C.*, 549 A.2d 1,

6 (D.C. 1988)).

Neither party disputes that expert testimony is required in this case to establish the

requisite standards of care. *See Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839,

845 (D.C. Cir. 2007) ("Pursuant to the expert testimony requirement, a plaintiff must put on

expert testimony to establish what the standard of care is if the subject in question is so distinctly

related to some science, profession or occupation as to be beyond the ken of the average

layperson.") (internal quotation marks and citations omitted); *see also D.C. v. Carmichael*, 577

A.2d 312, 314-16 (D.C. 1990) (requiring expert testimony to establish applicable standards of

care in suit by prisoner who was assaulted by fellow prisoners alleging that injuries were caused

by District's failure to control contraband). Plaintiff has in fact submitted copies of expert

reports written by her two expert penologists, Miller and Aiken, that set forth the various national

standards Plaintiff asserts are applicable in this case. *See* Miller Rep.; *see also* Aiken Rep.; *see

also* Pl.'s Opp'n at 14. Accordingly, as the Court understands Defendants' argument, they are

not challenging a lack of expert testimony, but rather the sufficiency of the expert testimony that

is provided by Plaintiff—namely, whether the Plaintiff's two designated expert penologists have

sufficiently set forth the applicable standards of care.

This question, however, is by no means a simple one. Under District law, expert

testimony

> is not sufficient if it merely consists of the expert's opinion as to what he or she
> would do under similar circumstances. Nor is it enough for the expert simply to
> declare that the [defendant] violated the national standard of care. Rather, the expert
> must clearly articulate and reference a standard of care by which the defendant's
> actions can be measured. Thus the expert must clearly relate the standard of care to
> the practices in fact generally followed by other comparable . . . facilities or to some
> standard nationally recognized by such units.

*Briggs*, 481 F.3d at 846 (quoting *Clark v. D.C.*, 708 A.2d 632, 635 (D.C. 1997)) (emphasis and

alterations in Briggs).  "Generalized references" to standards are insufficient; rather the "expert

must proffer 'a specific, articulable (and articulated) standard of care,'" and must relate those

standards "directly to the defendant's conduct."  *Briggs*, 481 F.3d at 846-47 (quoting *D.C. v.*

*Moreno*, 647 A.2d 396, 400 (D.C. 1994); *Carmichael*, 577 A.2d at 315-16; and *Phillips v. D.C.*,

714 A.2d 768, 773 (D.C.1998)).  Moreover, "articulation of a specific standard is essential

'[e]specially in circumstances in which . . . the defendant is alleged to have failed to protect the

plaintiff from harm.'"  *Briggs*, 481 F.3d at 847 (quoting *Varner*, 891 A.2d at 269) (alterations in

Briggs).

Nonetheless, despite the complexity of this issue and the importance of it to Plaintiff's

case, the parties' briefing on this point is wholly inadequate.  Defendants, for their part, have

entirely ignored the expert reports and opinions of Plaintiff's expert penologists, Miller and

Aiken, and do not include any citation to relevant case law specifically supporting their position

that Plaintiff has not sufficiently set forth the applicable standard of care in this case.  Indeed,

Defendants' opening brief provides only the barest of analysis on this issue, and their reply brief

fails to even mention it.  Plaintiff has similarly failed to provide the Court with an adequate

analysis.  Although Plaintiff has cited generally to her experts' reports, she has not provided the

Court with any case law demonstrating that the opinions set forth by her experts are legally

sufficient to establish the required standard of care.  This is particularly troublesome given that,

upon the Court's own brief review of the relevant case law, it appears that Defendants' assertions

may have some merit, at least as to some of Plaintiff's allegations.  *See, e.g., Carmichael*, 577

A.2d at 315 (finding that expert's testimony regarding use of metal detectors at jail was

insufficient where the testimony failed to discuss, "for example, that a certain percentage of

comparable facilities did have metal detectors" and that "[w]ithout such evidence the jury had not basis for comparing [the jail] with any other institution, and hence no basis for finding that [the jail's] failure to have functioning metal detectors in place amounted to a deviation from a demonstrated standard of care").

In light of the paucity of both parties' briefing on this issue, the Court concludes that it is in no position at this time to make a definitive ruling regarding the sufficiency of the Plaintiff's experts' testimony in establishing the necessary standard of care for her negligence-based claims. Accordingly, the Court DENIES Defendants' motion for summary judgment on this point.[24]

<u>2.</u>      <u>Genuine Disputes of Material Fact Preclude Summary Judgment</u>

Moving then to the second argument, Defendants appear to generally argue that Plaintiff cannot show that Defendants' policies, procedures, and practices or conduct were deficient, such that her claims fail regardless of the applicable standard of care.  As an initial matter, although Defendants' briefing purports to seek summary judgment on Plaintiff's negligence-based claims in their entirety, upon closer review of Defendants' briefing, it is apparent that they have asserted this second argument only with respect to the following specific allegations asserted by Plaintiff: (a) that Defendant Officials negligently failed to provide adequate numbers of correctional officers to housing units at all times; (b) that Defendant Officials negligently failed to require reasonably frequent and unannounced housing unit, inmate, and cell shakedowns; and (c) that Defendant Officials negligently failed to provide proper training and supervision for correctional officers.  *See* Defs.' MSJ at 39-41.

---

[24] The Court may permit Defendants to re-raise this issue at a later date in advance of trial, if appropriate.

The Court has already held that material factual disputes exist with respect to the Jail's staffing policies, its shakedown policies and practices, and the training of correctional officers in 2002. *See supra* at pp. 27-38. These same issues of disputed fact also preclude summary judgment with respect to Defendants' arguments relating to Plaintiff's negligence-based claims premised on the same factual allegations.

With respect to Plaintiff's allegations that the Defendant Officials negligently failed to provide adequate supervision, an issue which the Court has not yet had an opportunity to examine, it is also clear that summary judgment in Defendants' favor is inappropriate. Defendants' entire argument on this point consists of a single sentence in their opening brief. *See* Defs.' MSJ at 41. Moreover, Defendants have entirely ignored the proffered expert report by Aiken, Plaintiff's expert penologist, that catalogues a litany of deficiencies in the supervision of the Jail's correctional officers and employees. *See* Aiken Rep. at 16-18. Given Defendants' perfunctory analysis of this issue, the Court finds as well that Defendants have not shown they are entitled to summary judgment with respect to Plaintiff's allegations of inadequate supervision. Accordingly, the Court shall DENY Defendants' motion for summary judgment with respect to Plaintiff's negligent-based claims.

G.   *Plaintiff's Partial Motion for Summary Judgment is Denied-in-Part and Granted-in-Part*

Having resolved Defendants' motion for summary judgment, the Court now turns to Plaintiff's motion for partial summary judgment. Plaintiff has moved for summary judgment solely on the issue of whether Defendants may raise the defense of contributory negligence/assumption of risk at trial. Defendants indicated during discovery that they intend to

assert the affirmative defense of contributory negligence and/or assumption of risk, and that this defense is based on two alternative theories: (1) that Gaither had "involved himself in an altercation with one or more inmates," which led to his stabbing, *see* Pl.'s MSJ, Ex. 18 (Defs.' Responses to Plaintiff's Second Set of Discovery Requests, Interrogatory No. 2); and (2) that Gaither "failed to notify the District of Columbia of his participation as a witness in a murder investigation and never requested protective custody," *id.*  Plaintiff argues that there is no evidence in the record to support either theory of contributory negligence/assumption of risk, and the Court should therefore preclude Defendants from raising any such defenses at trial.

Defendants filed an opposition to Plaintiff's motion.  In so doing, Defendants responded only to Plaintiff's arguments concerning the second theory of contributory negligence—*i.e.*, that Gaither failed to notify the District of his grand jury testimony—and did not address Plaintiff's arguments with regards to the first theory.  Moreover, Defendants have admitted that there is no record evidence that Gaither voluntarily involved himself in any such altercation on December 14, 2002.  Defs.' Resp. ¶ 20.  The Court therefore understands Defendants to have conceded that there is no evidence in the record to support a possible defense of contributory negligence and/or assumption of risk based on Gaither's alleged voluntarily involvement in an altercation with other inmates.  *See Hopkins*, 284 F. Supp. 2d at 25 ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *see also Franklin*, 600 F. Supp. 2d at 60.  Accordingly, the Court deems Defendants to have waived any affirmative defense of contributory negligence and/or assumption of risk based upon claims that Gaither voluntarily involved himself in an altercation and GRANTS Plaintiff's motion to the extent she

seeks an order precluding Defendants from raising an affirmative defense based on such allegations.

The Court thus proceeds with the understanding that the only issue in dispute is whether Defendants can prove contributory negligence/assumption of risk based upon Gaither's alleged failure to notify Jail officials about his grand jury testimony.  Defendants oppose Plaintiff's motion, arguing that there is ample evidence in the record from which a jury could reasonably conclude that Gaither was contributorily negligent.

### 1.    Factual Background

As is relevant to Plaintiff's motion, several months prior to his incarceration in December of 2002, Gaither had testified before a Grand Jury investigating the murder of Kenneth Muldrow, Jr.  Pl.'s Stmt. ¶ 15.  According to the findings of a D.C. Superior Grand Jury, Gaither was ultimately killed because of this testimony.  *See id.* ¶¶ 14-15.  As previously explained, the Grand Jury indicted two of Gaither's fellow inmates, Delonte Kent and Matthew Ingram, for Gaither's First-Degree Murder, concluding that they had killed him because of his testimony before the Grand Jury investigating Muldrow's murder.  *Id.*  Ingram and Kent were subsequently tried for Gaither's murder, but were found "not guilty" by the jury on December 13, 2006.  *See* Joint Status Report and Consent Motion to Lift Stay, Docket [30].

Although the fact of Gaither's participation in the grand jury proceedings is undisputed, the relevant substance of his testimony is a matter of some debate between the parties—in particular, with respect to whether Gaither identified Ingram as a participant in Muldrow's

murder.[25]  According to Plaintiff, Gaither did not mention Kent in his grand jury testimony and affirmatively testified that Ingram was *not* a participant in the fatal attack on Muldrow.  *Id.* ¶¶ 16, 17; *see also* Pl.'s MSJ, Ex. 10 (Decl. of Kartik N. Venguswamy) ¶¶ 7, 9.  Defendants initially claimed that Gaither had identified Ingram as a participant in the attack on Muldrow, *see* Defs.' Stmt. ¶ 11, but failed to produce any evidence to that effect and have subsequently acknowledged that they "have been unable to locate defendants' copy of the tape of Mikal Gaither's grand-jury testimony," Defs.' Resp. ¶¶ 16, 17.  As Defendants have failed to refute Plaintiff's statement of fact with countervailing evidence, the Court proceeds with the understanding that Gaither did not identify Kent in his testimony before the Grand Jury and stated that Ingram was not involved with Muldrow's murder.

The parties dispute whether Gaither was ever directly asked during the intake process whether he had provided testimony against any individuals.  According to Defendants, the Jail's intake policy and practice requires that "inmates are interviewed and asked if they: a) have any enemies in the Jail, b) are testifying against anybody, and c) feel safe?"  Defs.' Stmt. ¶ 14.  Plaintiff does not dispute that inmates, including Gaither, are asked whether they have enemies in the Jail and whether they feel safe, but argues that inmates are not asked whether they "are testifying against anybody."  Pl.'s Resp. ¶ 14.  The evidence on this issue is conflicting.  On the one hand, Defendants rely on testimony indicating that inmates are asked a series of questions during intake, including whether the inmate is "testifying against anybody."  Pl.'s Opp'n, Ex. 7

---

[25] It appears that Ingram was eventually charged with Muldrow's murder.  *See* Defs.' Opp'n at 1.  Although this fact is significant in understanding the issues raised in Plaintiff's motion, neither party actually addressed this fact in their statement of material facts nor is there any record evidence suggesting the accuracy of this statement.  Accordingly, the Court has not relied on this statement in ruling on Plaintiff's motion.

(Deposition Testimony of Gary Brinson) at 97:15-22.[26]  As Plaintiff points out, however, Brinson also testified that Gaither would not have been asked more specifically "if he was participating as a witness in a murder investigation," because information regarding an inmate's status as a testifying witness should be recorded automatically in the Jail's computer system.  *Id.* at 102:15-103:22.  These statements appear to be contradictory to some extent.  In addition, Gaither's intake sheet itself reflects only that Gaither reported that he was "not separated from anyone" and did not "have any known enemies at the D.C. Detention Facility;" it includes no mention of whether Gaither ever testified against anyone.  Defs.' MSJ, Ex. G (intake form).  Factual disputes therefore exist as to what Gaither was asked during the intake process and, more specifically, whether he was asked if he had previously testified against anyone.

Upon admission to the Jail, Gaither was first assigned to the Northwest Three Housing unit.  Pl.'s Stmt. ¶ 24.  He was not moved to NE-3, where Ingram and Kent were housed, until 2:50 p.m. on December 14, 2002—*i.e.*, only three hours before he was stabbed.  *Id.* at 26.  Plaintiff contends that there is no evidence in the record that Gaither was aware that Ingram was an inmate in the Jail in December of 2002.  Pl.'s Stmt. ¶ 27.  Although Defendants dispute this fact, Defendants have not produced any evidence demonstrating that Gaither was in fact aware that Ingram was incarcerated at the Jail in the weeks and days before his attack.  At most, Defendants have introduced evidence that Gaither saw Ingram a few minutes before the attack on December 14, 2002.  Defs.' Resp. ¶ 26.  In support of this position, Defendants' rely soley on the

---

[26] Defendants have also relied on the deposition testimony of Defendant Harrison.  *See* Defs.' Stmt. ¶ 14.  As Plaintiff correctly notes, however, the cited portion of the testimony does not support the specific assertion that inmates are asked if they "are testifying against anybody" during the intake process.  *See* Pl.'s Resp. ¶ 14.

testimony of another inmate who apparently indicated during an interview with the MPD that he

had seen Gaither and Ingram walk up the stairs in the Jail together shortly before the attack.  *Id.*;

Defs.' Opp'n, Ex. E (Excerpt of Testimony provided by James E. Simpkin during Kent and

Ingram's criminal trial).  Although it is somewhat unclear, it appears that the witness later

recanted his statements that he had seen Gaither and Ingram together.[27]  *See* Pl.'s Reply at 4-5.

      2.    <u>Legal Standards</u>

Under District law, contributory negligence will generally bar recovery on a claim for

negligence.  *C&E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 263 (D.D.C. 2007).

Contributory negligence is defined as "the failure 'to act with the prudence of an ordinary

reasonable person under the circumstances.'"  *Krombein v. Gali Serv. Industr., Inc.*, 317 F. Supp.

---

[27] It is not altogether clear from the transcript that Defendants filed with this Court whether this witness recanted the entirety of his previous statement to the MPD or whether only certain statements.  *See* Defs.' Opp'n , Ex. E (Excerpt of Testimony provided by James E. Simpkin during Kent and Ingram's criminal trial).  As is relevant, after Simpkin confirmed that he had previously told the MPD that he had seen Gaither walk up the stairs with Ingram shortly before the attack, the following dialogue occurred:

> Q.  And after that you said you saw Mat putting something up into a slot by cell 53?
> A.  I guess so, yes.
> Q.  Well you say "you guess so," do you not remember this?
> A.  No, I don't.  I told you I didn't see this and so I made something up and now you're trying to refresh my memory to make me remember it, I'm going along but I can't tell you that I said it, I'm not saying this is a lie and I didn't say what you just said; I don't recall this.
> Q.  So you don't recall seeing Mat – or excuse me you don't' recall saying that you saw Mat put an object in the cell – excuse me, an object in a slot?
> A.  I don't recall it, but if you said I said it, then I said it.

*Id.* at p. 6 (82:3-16).  Although the witness states that he "didn't see this" and therefore "made something up," it is unclear from the transcript itself whether the witness is referring only to the immediately-preceding question (*i.e.*, that "Mat put[] something into a slot") or whether he is referring to the entire preceding exchange, including the statement that he saw Ingram and Gaither walk up the stairs together.

2d 14, 18 (D.D.C. 2004) (quoting *Queen v. Wash. Metro. Area Transit Auth.*, 842 F.2d 476, 479

(D.C. Cir. 1988)). "The District of Columbia has adopted the Restatement (Second) of Torts'

definition of contributory negligence which explains: '[a] plaintiff's contributory negligence may

be either (a) an intentional and unreasonable exposure of himself to danger created by the

defendant's negligence, of which danger the plaintiff knows or has reason to know, or (b)

conduct which, in respects other than those stated in Clause (a), falls short of the standard to

which the reasonable man should conform in order to protect himself from harm.'" *Id.* (quoting

*D.C. v. Brown*, 589 A.2d 384, 388, n. 6 (D.C. 1991)). The existence of contributory negligence

is normally a question of fact for the jury, and "'[o]nly in exceptional cases is evidence so clear

and unambiguous that contributory negligence should be found as a matter of law.'" *Id.* (quoting

*Lynn v. D.C.*, 734 A.2d 168, 172 (D.C. 1999)).

The affirmative defense of assumption of risk also presents a complete bar to a plaintiff's

recovery under D.C. law. *Krombein*, 317 F. Supp. 2d at 20. It applies "only where 'the plaintiff .

. . subjectively know[s] of the existence of the risk and appreciate[s] its unreasonable

character.'"[28] *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 42 (D.D.C. 2002). "The

---

[28] Curiously, although Plaintiff has moved for summary judgment on the issue of contributory negligence and/or assumption of risk, she failed to actually identify the relevant legal standards in her briefing. *See generally* Pl.'s MSJ; Pl.'s Reply. Perhaps as a result of this oversight, Plaintiff has argued—without legal citation—that both "contributory negligence and assumption of risk require a showing that Gaither actually knew and understood the full scope and magnitude of the risk posed by waiver and that he, nonetheless, exposed himself to it intentionally and unreasonably." Pl.'s Reply at 2. This assertion, however, is incorrect. As the case law makes clear, "[w]hile it may look like the doctrines of assumption of risk and contributory negligence overlap, a clear distinction exists between the two. As opposed to the objective standard employed under contributory negligence, assumption of risk applies where the plaintiff subjectively knows of the existence of the risk and appreciates its unreasonable character." *See Krombein*, 317 F. Supp. 2d at 20 (internal citations and quotation marks omitted).

standard is heavily fact-based, and summary judgment based on assumption of risk should therefore be granted only if no real dispute exists as to the plaintiff's awareness of the relevant danger." *Id.*

         <u>3.</u>    <u>Plaintiff Has Not Shown that she is Entitled to Summary Judgment on the Affirmative Defenses of Contributory Negligence and/or Assumption of Risk Based on Allegations that Gaither Should Have Disclosed his Involvement in a Grand Jury Investigation</u>

As explained above, Plaintiff has moved for summary judgment, arguing that no reasonable jury could find that either of these affirmative defenses apply based on the record evidence in this case.  The Court disagrees.  Taken in a light most favorable to Defendants as the non-moving party, the evidence shows that Gaither had participated as a witness in a grand jury murder investigation less than a year before he was incarcerated at the Jail and that he failed to disclose this fact to Jail officials at anytime during his incarceration in December of 2002.  Although the parties dispute whether Gaither was specifically asked about this information during his intake process and whether he actually knew that Ingram was also incarcerated at the Jail, a reasonable jury could nonetheless question whether Gaither was negligent in failing to affirmatively disclose his participation in a grand jury investigation to Jail officials.  As Plaintiff herself admits, being viewed as a "snitch" or cooperator is "dangerous."  *See* Pl.'s Reply at 3.  Given that Gaither was no stranger to the Jail environment, having previously been incarcerated that same year, a reasonable jury could conclude that Gaither, as a cooperating witness in a homicide investigation, should have reasonably notified Jail officials of this fact upon admission to the facility— regardless of whether the Jail officials specifically asked him about any prior involvement in a grand jury investigation or whether he knew of Ingram's incarceration at the Jail.  Admittedly, the evidence on this record relevant to the affirmative defenses of contributory

negligence and/or assumption of risk is minimal, but given the "heavily-fact based" nature of these inquiries, the applicability of both defenses is best left to the jury at this point.  The Court therefore DENIES Plaintiff's motion for partial summary judgment and Defendants are not precluded from raising these affirmative defenses at trial based upon allegations that Gaither should have informed Jail officials about his grand jury testimony.

## IV.  CONCLUSION

For the reasons set forth above, the Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion for Summary Judgment and GRANTS-IN-PART and DENIES-IN-PART Plaintiff's Motion for Partial Summary Judgment as follows.  ***First***, with respect to Defendants' Motion for Summary Judgment, the Court hereby orders that:

(1)     Defendants' motion is DENIED insofar as Defendants assert that issue preclusion bars Plaintiff's Section 1983 claim;

(2)     Defendants' motion is GRANTED insofar as it seeks dismissal of Plaintiff's claims against Defendant Officials in their official capacity as redundant of her claims against the District;

(3)     Defendants' motion is DENIED with respect to Plaintiff's Section 1983 claim against the District based upon the existence of genuine disputes of material fact;

(4)     Defendants' motion is DENIED with respect to the Defendant Officials' claims of qualified immunity as against Plaintiff's Section 1983 claim based upon the existence of genuine disputes of material fact;

(5)     Defendants' motion is GRANTED with respect to the Defendant Correctional Officers' claims of qualified immunity as against Plaintiff's Section 1983 claim;

and

(6)     Defendants' motion is DENIED with respect to Plaintiff's negligence-based

        claims based upon the existence of genuine disputes of material fact.

**Second**, with respect to Plaintiff's Motion for Partial Summary Judgment, the Court

GRANTS Plaintiff's motion as conceded to the extent she seeks an order precluding Defendants

from raising an affirmative defense based on allegations that Gaither voluntarily involved himself

in an altercation, but DENIES Plaintiff's motion to the extent she seeks a similar order

precluding Defendants from raising such affirmative defenses based on allegations that Gaither

should have notified Jail officials of his involvement with a grand jury murder investigation.

**Third**, Plaintiff shall file a status report with the Court, on or before **September 30, 2009**,

explaining why John Does 1-20 have not been served.  If no such explanation is timely filed, the

Court shall dismiss Does 1-20 as Defendants in this action, pursuant to Federal Rule of Civil

Procedure 4(m).  An appropriate Order accompanies this Memorandum Opinion.

Date:   September 8, 2009

                        _____/s/_____
                        COLLEEN KOLLAR-KOTELLY
                        United States District Judge