## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF MIKAL R. GAITHER,
by and through Pearl Gaither, Personal
Representative,

      Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

Civil Action No. 03-01458 (CKK)

## MEMORANDUM OPINION AND ORDER
(December 19, 2011)

Plaintiff Pearl Gaither ("Plaintiff"), the representative of the estate of Mikal R. Gaither

("Gaither"), brings this action against the District of Columbia (the "District") and a series of

individual defendants seeking damages in connection with Gaither's fatal stabbing while he was

incarcerated pending sentencing at the District's Central Detention Facility.  Plaintiff has

indicated an intention to present expert testimony at trial from Michele Roberts, Esq. ("Roberts")

concerning the sentence Gaither likely would have received had he survived in support of her

alleged damages.  The matter comes to this Court on the District's [113] Motion to Strike

Plaintiff's Expert Michelle [sic] Roberts, Esq. ("Motion to Strike"); the Honorable Magistrate

Judge Alan Kay's [120] Memorandum Order resolving the District's Motion to Strike; Plaintiff's

[235] Updated Memorandum in Support of Expert Testimony of Plaintiff's Sentencing Expert;

the District's [246] Updated Memorandum in Opposition to Plaintiff's Updated Memorandum in

Support of Plaintiff's Sentencing Expert; and Plaintiff's [236] Motion for Leave to Supplement

Expert Report of Michele Roberts, Esq. ("Motion to Supplement").  Upon consideration of the

parties' submissions, the relevant authorities, and the record as a whole, the Court concurs with

Magistrate Judge Kay that Roberts should be precluded from testifying as to her opinion of the sentence that Gaither likely would have received in his criminal case. However, the Court finds that Roberts may provide generalized testimony about the factors that a judge might take into account in the course of sentencing a criminal defendant, an issue that was not addressed by Magistrate Judge Kay in his Memorandum Order.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in detail the extensive factual and procedural background of this case.

On December 14, 2002, Gaither was fatally stabbed by a fellow inmate while incarcerated at the District's Central Detention Facility. A subsequent investigation concluded that two of Gaither's fellow inmates had forced Gaither into an open cell and proceeded to stab him, and indications were that Gaither had been killed because of his involvement in a grand jury investigation into the murder of an individual by the name of Kenneth Muldrow.

Plaintiff brings this action on behalf of Gaither's estate. She asserts claims under, *inter alia*, Section 1 of the Ku Klux Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, against the District and a series of individual officials and correctional officers, seeking compensatory damages against each defendant in the amount of $10 million.

Significantly, at the time of his death, Gaither had already pleaded guilty to one felony count of distribution of cocaine and was awaiting sentencing in the Superior Court of the District of Columbia by the Honorable Judge Noël Anketell Kramer, who was then the Presiding Judge

of the Criminal Division.[1]  Under the statute that applied at the time, Gaither's conviction carried

a possible sentence ranging from probation to thirty years' incarceration.  *See* D.C. CODE § 33-

541(a)(1) (1981).  Due to Gaither's untimely death, his actual sentence will never be known.

Nevertheless, because the parties agree that Gaither would not have suffered lost wages for any

period that he was incarcerated, the sentence Gaither likely would have received is an important

ingredient of Gaither's lifetime earning potential, which in turn is a large part of Plaintiff's

claimed compensatory damages in this case.  Distilling the matter to its essence, should the jury

ever need to reach the issue, the less time it finds that Gaither would have spent in jail, the

greater Plaintiff's damages.

For this reason, during the course of discovery, Plaintiff designated Roberts to testify as a

"sentencing expert" and, more precisely, to provide an opinion as to the sentence that Gaither

likely would have received had he lived.[2]  Roberts subsequently prepared, and Plaintiff produced,

a three-page written report, in which she stated her "opinion that, had he lived, Mr. Gaither

would have been sentenced to probation for his first felony conviction on a single count of

distribution of cocaine."  Report of Michele A. Roberts, Esq. ("Roberts' Rep."), ECF No. [113-

3], at 1.  According to her report, Roberts based her opinion on the following:

(1)     Her experience representing criminal defendants in the District of Columbia;

(2)     Her experience as a member of the Sentencing Commission for the District of

_____

[1]  In 2005, Judge Kramer was appointed an Associate Justice of the District of Columbia Court of Appeals.

[2]  Neither side suggests that Judge Kramer ever reached a decision about how she would actually sentence Gaither.  In any event, ethical considerations prevent Judge Kramer from testifying in this case.  *See* Decl. of John Moustakas, Esq., ECF No. [235-10], ¶ 2.

Columbia;

(3)     Her review of historical sentencing data and guidelines;

(4)     Her review of information bearing on Gaither's character, upbringing, and family

history and circumstances; and

(5)     Her review of information in documents provided by Plaintiff's counsel.

*See id.* at 1.

While acknowledging that "the statutory maximum sentence for distribution of cocaine was 10 to 30 years at the time of Mr. Gaither's offense," Roberts opines in her report that "a defendant without a prior felony conviction was more likely than not to receive a sentence of probation upon conviction for this offense, both according to the relevant historical data and based on [her] own experience." *Id.* According to Roberts, "[t]hat is because judges were generally concerned about proportionality in sentencing—*i.e.*, treating like offenders alike—and, consequently, exercised their sentencing discretion in a manner that took into account criminal history as well as mitigating factors." *Id.* In her report, Roberts identifies three "aggravating factors" and nine "mitigating factors"[3] that she contends supports her opinion that Gaither likely would have received probation as a sentence. *Id.* at 2-3. The three aggravating factors include:

(1)     Gaither's testing positive for cocaine on three occasions—on September 19,

September 30, and October 3, 2002, while under pretrial supervision and in

violation of his conditions of release and after his graduation from a three-month

---

[3] Consistent with the parties' usage, the Court shall loosely use the terms "aggravating factors" and "mitigating factors" when speaking of factors negatively and positively affecting a criminal defendant's sentence, rather than as terms of art often used in connection with standardized sentencing guidelines.

Harbor Lights residential drug treatment program;

(2)     Gaither's two prior misdemeanor convictions for possession of marijuana; and

(3)     Gaither's pending charge of felony possession with intent to distribute cocaine, which was set to be dismissed at sentencing but was nonetheless pending as of his death.

*See id.* at 2.  Meanwhile, the nine mitigating factors identified by Roberts in her report are as follows:

(1)     Events in Gaither's life that were "beyond his control" that "caused him to spiral into despair," including the death of his sister, which Roberts indicates led Gaither to begin using drugs and to sell drugs to "feed his habit";

(2)     Gaither's demonstrated "ability to succeed under court supervision," having successfully completed probation in his two prior misdemeanor cases;

(3)     Gaither's successful completion of a three-month residential drug rehabilitation program, even though he "suffered a relapse after leaving the program," and his active search for "further drug rehabilitation";

(4)     Gaither's "deeply caring and supportive family";

(5)     Gaither's access to "excellent role models," in particular his mother and two older brothers, all of whom had "long and steady work histories";

(6)     Gaither's "prior work history";

(7)     Gaither's genuine interest in "improving his prospects," including "developing marketable work skills";

(8)     Judge Kramer's attendance at Gaither's graduation from the drug rehabilitation

program and his funeral; and

(9)     Gaither's voluntary cooperation with a grand jury investigation of the murder of

Kenneth Muldrow.

*Id.* at 2-3.

Believing that Roberts' opinion, as set forth in her written report, did not satisfy the

requirements of Rule 702 of the Federal Rules of Evidence, the District filed its [113] Motion to

Strike, seeking to preclude Roberts from testifying on how a presiding judge may have ruled in

Gaither's case.  *See* Mem. of P. & A. in Supp. of Defs.' Mot. to Strike Pl.'s Expert Michelle [sic]

Roberts, ECF No. [113].  Plaintiff subsequently filed an opposition, the District filed a reply,

and, with the Court's leave, Plaintiff filed a surreply.  *See* Pl.'s Opp'n to the District of

Columbia's Mot. to Strike Pl.'s Sentencing Expert Roberts, ECF No. [114]; Def. District of

Columbia's Reply to Pl.'s Opp'n to the District of Columbia's Mot. to Strike Expert Michelle

[sic] Roberts, ECF No. [115]; Pl.'s Sur-Reply in Opp'n to the District of Columbia's Mot. to

Strike Pl.'s Experts, ECF No. [119].  In a detailed [120] Memorandum Order, Magistrate Judge

Kay, to whom this action was referred under Local Civil Rule 72.2(a), granted the District's

Motion to Strike in relevant part.  Magistrate Judge Kay concluded that Roberts should be

precluded from testifying as to the opinion that Gaither likely would have received probation had

he lived, finding that the methodology underlying her opinion, as reflected in her three-page

written report, failed to meet the standards of reliability set forth in Rule 702.  Magistrate Judge

Kay was neither asked to, nor did, determine whether Roberts could provide more generalized

testimony, such as testimony about the factors judges are likely to consider when sentencing a

criminal defendant.

Subsequently, Plaintiff filed objections to Magistrate Judge Kay's ruling, and the District filed a response to those objections.  *See* Pl.'s Mem. of Law in Supp. of Her Objections to Magistrate Judge Kay's Order Granting in Part the District's Mot. to Strike Pl.'s Experts, ECF No. [126-1]; Def. District of Columbia's Mem. of P. & A. in Opp'n to Pl.'s Mem. of Law in Supp. of Her Objections to Judge Kay's Order Granting the District's Mot. to Strike Pl.'s Sentencing Expert, ECF No. [129].  The Court heard oral argument on Plaintiff's objections, during which the Court raised various questions concerning Roberts' methodology and her ultimate conclusion.  *See* Tr. of Status Hr'g, ECF No. [187].  Later, without objection, the Court held a thorough *Daubert* hearing,[4] during which the parties had a full and fair opportunity to probe the reliability of Roberts' methodology and conclusions.  *See* Tr. of Daubert Hr'g, ECF No. [188].  Following the hearing, the parties filed supplemental memoranda addressing the reliability of Roberts' proffered testimony.  *See* Def. District of Columbia's Suppl. Mem. of P. & A. in Opp'n to Pl.'s Objections to Judge Kay's Order Granting the District's Mot. to Strike Michele Roberts, Esq., as a Sentencing Expert in this Case, ECF No. [153]; Pl.'s Am. Opp'n to Defs.' Suppl. Mem. of P. & A. in Opp'n to Pl.'s Objections to Magistrate's Order Striking Pl.'s Sentencing Report, ECF No. [172-1]; Pl.'s Am. Notice of Filing of Signed Decl. of Michele A. Roberts, Esq., ECF No. [177]; Defs.' Reply to Pl.'s Opp'n to Defs.' Suppl. Mem. of P. & A. in Opp'n to Pl.'s Mem. of Law in Supp. of Her Objections to Judge Kay's Order Granting in Part the District's Motion to Strike Pl.'s Experts, ECF No. [176].

Thereafter, a number of developments changed the landscape of this case.  Most notably,

---

[4]  The phrase is a reference to the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

the Court resolved the parties' cross-motions for summary judgment and granted Plaintiff leave

to amend her complaint.  *See Estate of Gaither ex rel. Gaither v. District of Columbia*, 655 F.

Supp. 2d 69 (D.D.C. 2009).  Accordingly, the Court invited the parties to inform the Court

whether they believed additional briefing as to the admissibility of Roberts' testimony would be

desirable.  *See* Order, ECF No. [222].  After the parties weighed in, the Court set a schedule for

the submission of updated memoranda.  *See* Min. Order (Mar. 31, 2011).  The parties were

directed to file consolidated memoranda and were expressly warned that their "submissions must

raise *any and all* arguments they may have regarding the admissibility of Roberts' testimony at

trial" and that the Court would "not consider prior submissions."  *Id.* (emphasis added).  Plaintiff

filed her memorandum on April 20, 2011.  *See* Pl.'s Updated Mem. in Supp. of Expert Test. of

Pl.'s Sentencing Expert ("Pl.'s [235] Mem."), ECF No. [235].  The District filed its

memorandum on May 11, 2011.  *See* Def.'s Updated Mem. in Opp'n to Pl.'s Updated Mem. in

Supp. of Pl.'s Sentencing Expert ("Def.'s [246] Mem."), ECF No. [246].  These memoranda

supersede the parties' prior submissions on this matter and, as a result, are the primary focus of

the Court's attention in this Memorandum Opinion and Order.

Plaintiff claims to have discovered additional materials supporting Roberts' opinion since

the Court held the *Daubert* hearing.  Specifically, Plaintiff has since located:

(1)	A Presentence Investigation Report drafted in March 2002 in connection with

Gaither's criminal case before Judge Kramer; and

(2)	Transcripts of hearings before Judge Kramer in Gaither's criminal case.

Plaintiff filed her [236] Motion to Supplement, seeking leave to supplement Roberts' expert

report to reference these additional materials.  *See* Pl.'s Mem. of P. & A. in Supp. of Her Mot. for

8

Leave to Supplement Expert Report of Michele Roberts, Esq., ECF No. [236-1].  The District

filed an opposition to Plaintiff's Motion to Supplement.  *See* Def.'s Mem. of P. & A. in Opp'n to

Pl.'s Mot. to Supplement Expert Report of Michele Roberts, Esq., ECF No. [245].  Plaintiff filed

a reply.  *See* Reply in Supp. of Pl.'s Mot. for Leave to Supplement Expert Report of Michele

Roberts, Esq., ECF No. [251].  In her proposed supplemental written report, Roberts references

the additional materials to support "additional mitigating facts."  Suppl. Report of Michele A.

Roberts, Esq. ("Suppl. Roberts' Rep."), ECF No. [236-10], at 3.  Her underlying opinion, and

accompanying methodology, remain fundamentally the same as in her original written report.

*See id.* at 1.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized
>        knowledge will help the trier of fact to understand the
>        evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and
>        methods; and
>
> (d)    the expert has reliably applied the principles and
>        methods to the facts of the case.

FED. R. EVID. 702.[5]  The trial judge has "considerable leeway in deciding in a particular case how

to go about determining whether particular testimony is reliable."  *Kumho Tire Co., Ltd. v.*

---

[5]  The Court references the amended Federal Rules of Evidence that became effective on December 1, 2011, which will apply at the trial in this case.

*Carmichael*, 526 U.S. 143, 152 (1999).  "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (*en banc*), *cert. denied*, 544 U.S. 1063 (2005).  In all cases, "[t]he trial judge . . . must find that [the proffered testimony] is properly grounded, well-reasoned and not speculative before it can be admitted."  FED. R. EVID. 702 advisory committee's note (2000 amends.).

### III.  PRELIMINARY MATTERS

As a preliminary matter, the parties disagree as to the scope of the Court's review of the District's [113] Motion to Strike, which comes to this Court upon Plaintiff's objections to Magistrate Judge Kay's [120] Memorandum Order granting the District's motion in relevant part and precluding Roberts from testifying at trial as to the sentence Gaither likely would have received.  Because the motion was decided by Magistrate Judge Kay pursuant to a reference under Local Civil 72.2(a), this Court may modify or set aside any portion of his decision "found to be clearly erroneous or contrary to law."  LCvR 72.2(c); *accord* 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a).  In the abstract, this means that the Court conducts a plenary review of matters of law, but is bound by Magistrate Judge Kay's findings of fact and discretionary determinations unless they are clearly erroneous.  *Am. Ctr. for Civil Justice v. Ambush*, __ F. Supp. 2d __, 2011 WL 2600497, at *4 (D.D.C. July 1, 2011).  However, because the admissibility of expert testimony frequently turns on legal questions "intertwined with factual issues that are in turn tinged with aspects of discretion," Charles A. Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3069 (2d ed. 1987), the scope of the Court's review is "not

monolithic," *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 13 (1st Cir. 2011)

(citation omitted); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir.

2005).  Nonetheless, the guiding principle—that the trial judge may not substitute her judgment

for the magistrate's—remains the same.

However interesting the interaction between these principles may be, they need not detain

the Court long here for the simple reason that the result is the same regardless of the standard of

review applied.  On the one hand, the Court finds that Magistrate Judge Kay's determination that

Roberts should be precluded from testifying about the sentence that Gaither likely would have

received had he survived is not clearly erroneous, contrary to law, or an abuse of discretion.  On

the other hand, even if the Court were to subject the admissibility of Roberts' testimony to

plenary review, it would similarly conclude, in an exercise of its broad discretion, that Roberts

should be precluded from testifying about the sentence that Gaither likely would have received

had he lived to be sentenced in his criminal case.

For purposes of economy and clarity, the Court's discussion below shall be styled simply

as if the Court conducted a plenary review, the standard of review that is more generous to

Plaintiff's position.  Such an approach is particularly useful in this case because, in the time since

Magistrate Judge Kay rendered his opinion, the parties have refined their positions and legal

arguments and the Court has the benefit of having conducted a *Daubert* hearing.  It is also helpful

because some of the matters now before the Court were not before Magistrate Judge Kay at all,

including Plaintiff's [236] Motion to Supplement and the question of whether Roberts may

provide generalized testimony about the factors that a judge might take into account in the course

of sentencing a criminal defendant.  *See Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 599 (D.C. Cir.

1988) (noting that matters that were not before the magistrate judge are not binding on the district court), *cert. denied*, 489 U.S. 1010 (1989).

## IV.  DISCUSSION

Plaintiff has indicated her intention to call Roberts at trial to testify as to her "opinion that, had he lived, Mr. Gaither would have been sentenced to probation for his first felony conviction on a single count of distribution of cocaine."  Roberts' Rep. at 1; *see also* Suppl. Roberts' Rep. at 1 (same).  More precisely, in a refinement that did not crystallize until after Magistrate Judge Kay rendered his decision, Plaintiff intends to call Roberts to testify "about how a reasonable judge (including Judge Kramer) would have decided Mr. Gaither's sentence and that the likely sentence would have been probation."[6]  Pl.'s [235] Mem. at 1.  The District challenges the admissibility of Roberts' proffered testimony under Rule 702 of Federal Rules of Evidence, which requires Roberts' opinion to be (1) "help[ful to] the trier of fact," (2) "based on sufficient facts or data," and (3) "the product of reliable principles and methods," that are (4) "reliably applied . . . to the facts of the case."  FED. R. EVID. 702.[7]  For the reasons set forth

---

[6] Roberts' original three-page written report, which was the focus of Magistrate Judge Kay's attention, made no mention of the "reasonable judge" and instead referenced only Judge Kramer.

[7] Rule 702 also requires the witness to be "qualified as an expert by knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  In this case, there is no dispute that Roberts has significant experience and knowledge about sentencing practices, including sentencing practices in the Superior Court of the District of Columbia, where Gaither's criminal case was pending at the time of his death.  From 1980 to 1988, Roberts was an attorney with the Public Defender Service, during which she had a four-year tenure as the Deputy Chief of the Trial Division.  *See* Decl. of Michele A. Roberts, Esq. ("Roberts Decl."), ECF No. [235-9], ¶ 3. From 1988 to 2001, she represented criminal defendants in private practice.  *See* Tr. of Daubert Hr'g at 32-33.  Since 2001, she has served as a member of the Sentencing Commission for the District of Columbia and has continued her private practice.  *Id.* at 19.

below, the Court concurs with Magistrate Judge Kay that Roberts should be precluded from testifying as to her opinion of the sentence that Gaither likely would have received in his criminal case, regardless of whether that testimony is framed in terms of how a "reasonable judge" or how Judge Kramer would have sentenced Gaither.  However, the Court finds that Roberts may provide generalized testimony about the factors that a judge might take into account in the course of sentencing a criminal defendant.

A.  *Plaintiff Has Conceded that Roberts Cannot Testify as to the Sentence Judge Kramer Likely Would Have Imposed in Gaither's Criminal Case*

The Court begins by denoting what is no longer in dispute.  According to Plaintiff, Roberts will "testify about how a *reasonable judge* . . . would have decided Mr. Gaither's sentence." Pl.'s [235] Mem. at 1 (emphasis added).  She disclaims that Roberts will "make any attempt to predict the likely sentence *Judge Kramer* would have imposed." *Id.* at 19 (emphasis added).  Based on this explicit concession, the Court shall preclude Roberts from testifying as to the sentence Judge Kramer likely would have imposed in Gaither's criminal case.

B.  *Roberts Cannot Testify as to Her Opinion that Judge Kramer Was "Down the Middle" and "Not an Outlier" in Her Sentencing Practices*

In a stunning feat of legal jujitsu, Plaintiff at one moment disclaims that Roberts will "make any attempt to predict the likely sentence Judge Kramer would have imposed," Pl.'s [235] Mem. at 19, and then proceeds to represent that Roberts will testify "about how a reasonable judge (*including Judge Kramer*) would have decided Mr. Gaither's sentence," *id.* at 1 (emphasis added).  Through this act of contortion, Plaintiff, quite transparently, seeks to backdoor an opinion about the sentence Judge Kramer likely would have imposed in Gaither's case by

13

characterizing Judge Kramer as a "reasonable judge."  But what Plaintiff seems to recognize she cannot get through the front door cannot come in through the back.

Conveniently glossed over by Plaintiff is that she needs Roberts to offer two different opinions to get to her desired end-point.  Specifically, Roberts must first opine about how a "reasonable judge" would have sentenced Gaither.  Then, she must opine about how Judge Kramer was situated vis-à-vis the so-called "reasonable judge."  In this regard, the connective tissue, as it were, is Roberts' opinion that Judge Kramer was "down the middle" and "not an outlier" in her sentencing practices.

Plaintiff's efforts fail at both stages.  At the first stage, Roberts cannot offer an opinion as to how a "reasonable judge" would have sentenced Gaither, a matter the Court addresses below. *See infra* Part IV.C.  However, even assuming that Roberts could offer such an opinion, the Court would nonetheless find that Roberts cannot offer an opinion as to whether Judge Kramer was "down the middle" and "not an outlier" in her sentencing practices because Plaintiff has failed to show that such an opinion would be "based on sufficient facts or data" and "the product of reliable principles and methods."[8]  FED. R. EVID. 702.

At the *Daubert* hearing, Roberts testified as follows:

> Q.    * * * Do you have an opinion based on your experience at the Public Defender Service, particularly seeing cases that you supervised that came before Judge Kramer as to what she would have done?
>
> A.    What Judge Kramer would have done?

---

[8]  The Court, of course, expresses no opinion as to Judge Kramer's actual sentencing practices; rather, the Court's review is confined to the record supporting Roberts' proffered testimony.

Q.      Yes.

A.      I believe that she would have, as a reasonable judge, and I think Judge Kramer is a reasonable judge, she would have imposed a sentence of probation.

Q.      Do you have a basis for knowing, during your time as — particularly as a supervisor in seeing the larger volume of cases you described earlier, whether Judge Kramer was regarded as an outlier judge or as a sort of down the middle judge?

A.      Judge Kramer was considered down the middle.  She was not an outlier.

Tr. of Daubert Hr'g at 57.  But when pressed to explain the basis for her opinion that Judge Kramer is a "reasonable judge," "down the middle," or "not an outlier," Roberts conceded that she had not reviewed data specific to Judge Kramer's historical sentencing patterns, as opposed to judges of the Superior Court as a whole.[9]  *See id.* at 62-63, 66-67.  Instead, Roberts testified that she has "some sense" of what Judge Kramer's sentencing practices were in the relevant time period because her tenure in the Public Defenders Service "overlapped with the time that Judge Kramer was on the bench."  *Id.* at 17.  Despite this assertion, by her own admission, Roberts' opinion of Judge Kramer's sentencing practices "did not come from [her] own experience," *id.* at 108-09, and she concedes that she has "no memory one way or the other" of whether she ever

_____

[9]  Plaintiff avers that "there is no judge-specific sentencing data available," Pl.'s [235] Mem. at 20 (citing Aff. of Kim. S. Hunt ("Hunt Decl."), ECF No. [235-12], ¶ 11), but the evidence relied upon by Plaintiff, an affidavit from the Executive Director of the Sentencing Commission for the District of Columbia, does not support such a broad assertion.  Rather, the Executive Director merely affirms, to the best of her knowledge, that there is no pre-existing judge-specific breakdown of a particular statistical analysis used by the Sentencing Commission to evaluate the historical sentencing patterns for judges across the Superior Court.  *See* Hunt Decl. ¶ 11.  Accordingly, it is undisputed that Roberts' opinion about how Judge Kramer was situated vis-à-vis the so-called "reasonable judge" is not based on sentencing data specific to Judge Kramer.

had a case analogous to Gaither's before Judge Kramer, *id.* at 70.

With this limited showing, Plaintiff has failed to satisfy the Court that Roberts' opinion about how Judge Kramer was situated vis-à-vis the so-called "reasonable judge" is "based on sufficient facts or data" and "the product of reliable principles and methods." FED. R. EVID. 702. The record is devoid of any *meaningful measure of detail* about the extent of Roberts' experience with and knowledge of Judge Kramer's sentencing practices specifically.  This Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  In this case, apart from knowing that Roberts has *some* knowledge of Judge Kramer's sentencing habits by virtue of her experience (knowledge that is largely secondhand), the Court is left only with Roberts' unvarnished opinion that Judge Kramer is a "reasonable judge," "down the middle," or "not an outlier." *Cf. Frazier*, 387 F.3d at 1253 (upholding trial judge's decision to exclude expert testimony where expert identified a single specific investigation involving the subject matter of his opinion; the expert "made no effort to quantify in any way the number of cases he was personally involved in" that implicated the same subject matter).  To put it simply, there is too great an analytical gap between the factual basis and the proffered opinion to satisfy the Court that Roberts' opinion is "based on sufficient facts or data" and "the product of reliable principles and methods." FED. R. EVID. 702.[10]  Accordingly, the Court shall preclude Roberts from

---

[10]  Nor has Plaintiff established that Roberts' opinion could be "reliably applied . . . to the facts of the case," FED. R. EVID. 702, given Roberts' inability to identify with any meaningful level of detail the extent of her experience with and knowledge of Judge Kramer's practices in sentencing criminal defendants similarly situated to Gaither.  Whether Judge Kramer was "down the middle" or "not at outlier" when sentencing defendants charged with different criminal offenses, for example, is immaterial to her proffered opinion in this action.

16

testifying as to her opinion that Judge Kramer was a "reasonable judge," "down the middle," and "not an outlier" in her sentencing practices.

> C. *Roberts Cannot Testify as to the Sentence a "Reasonable Judge" Likely Would Have Imposed in Gaither's Criminal Case*

The Court now turns to the heart of Roberts' proffered testimony.  According to Plaintiff, Roberts will "testify about how a reasonable judge . . . would have decided Mr. Gaither's sentence."  Pl.'s [235] Mem. at 1.  In an exercise of its broad discretion in these matters, the Court finds that Roberts' opinion as to how a "reasonable judge" would have sentenced Gaither should be excluded under both Rule 702 and Rule 403 of the Federal Rules of Evidence.  The Court addresses each ground for exclusion in turn.

> 1. <u>Rule 702</u>

To reiterate, Rule 702 requires Roberts' opinion to be, *inter alia*, (1) "based on sufficient facts or data," and (2) "the product of reliable principles and methods," that are (3) "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.

> i. "Sufficient Facts or Data"

In this case, the Court shall first assume, without deciding, that Roberts' substantial experience and knowledge of sentencing practices in the Superior Court, the same factors that qualify her as an expert to begin with, coupled with her review of historical sentencing data compiled by others, constitute "sufficient facts or data" to support some form of a predictive judgment about how a judge might sentence a criminal defendant in a particular case.  *See* Tr. of Daubert Hr'g at 19 (identifying the bases for Roberts' proffered opinion); Roberts' Rep. at 1

(same).[11]  At the very least, the record is consistent with such an assumption.  As an experienced practitioner, Roberts was consistently called upon to make a predictive judgment about the sentence a client might receive, and she testified that this task was important to her day-to-day work over the years:

> Q.    . . . [W]hat role did the evaluation of or assessment of the client's exposure play in your every day life as a line defender handling distribution, PWID, possession with intent to distribute cases?
>
> A.    It was fairly critical . . . .  Most of the cases, I venture to say as many as 75 percent to 80 percent of the cases resulted in a disposition, meaning a plea as opposed to going to trial.  So, evaluating the case for purposes of determining what the likely sentence was for something, you would do routinely and consistently.  Also, those cases were the kind of cases where you were most likely to receive a plea offer from the Government very early on in the life of the case.  * * *  In drug cases, frequently you'd receive a plea offer at the very same time that the case would come into the system.  So that was something — assessing the case for potential sentencing was something we did routinely.
>
> Q.    And do you have an opinion about whether that assessment was something that clients came to ask for an eventually — and also to rely on?
>
> A.    Absolutely.
>
> Q.    . . . [T]ell the Court what impact, knowing that the clients would put such reliance on your evaluation of the merits of the case and the likely sentence if the case were to result in a plea, what impact that had on the rigor with which you approached the assessment of the case.
>
> A.    Well, the client wanted to know, frankly, whether it was worth the risk of trial.  And my ability to communicate to the client what I believed the sentence would be and why I

---

[11]  The additional materials identified in Roberts' proffered supplemental report would not alter the Court's analysis.

> believe[d] the sentence would be what I was predicting was
> critical in their determination of whether to waive their rights
> to a trial by jury or not.  To be right was not only useful, but
> important.  And so, yes, I mean, the question, "[W]hat am I
> facing[?]" was fairly routine in my practice.

Tr. of Daubert Hr'g at 12-13.  To quantify this experience, Roberts claims that she has had some

level of involvement in somewhere between 1,500 to 2,400 criminal drug cases in the period

from 1988 to 2001, either as a trial attorney or as a supervisor of other trial attorneys.  *See id.* at

96-100; Roberts Decl. ¶ 3.  In the time period after Gaither would have been sentenced, Roberts

garnered additional experience as a member of the Sentencing Commission for the District of

Columbia, which required her involvement in discussions about sentencing philosophies and

trends, as well as in her private practice.  *See* Tr. of Daubert Hr'g at 19, 102.  On this record, the

Court shall assume that Roberts' opinion is "based on sufficient facts or data."  FED. R. EVID.

702.[12]

        ii.      "Reliable Principles and Methods"

Even with the foregoing assumption, Plaintiff still must show that Roberts' opinion is

"the product of reliable principles and methods."  FED. R. EVID. 702.  In this regard, Plaintiff

fairly summarizes Roberts' relied-upon "methodology" for making a predictive sentencing

judgment as follows:

---

[12]  The assumption is not an unassailable one.  Roberts' experience with sentencing
generally, or sentencing in criminal drug cases, does not ineluctably lead to the conclusion that
she has sufficient experience in each of the sentencing considerations relevant to Gaither's case.
For instance, Roberts testified that she believes that criminal defendants who cooperate with
authorities *without* the benefit of a formal cooperation agreement, like Gaither, are treated more
favorably by sentencing judges than criminal defendants who cooperate *with* the benefit of a
formal cooperation agreement.  *See* Tr. of Daubert Hr'g at 54-55.  However, Roberts concedes
that her personal experience was limited to "a couple" of instances in which a criminal defendant
participated without the benefit of a formal cooperation agreement.  *Id.* at 54.

> In assessing the likely sentence, . . . [Roberts] considers: the nature of
> the offense, whether the offender pleads guilty or is convicted at trial,
> social and family history, employment history, ties to the community,
> and certain positive and negative factors that are demonstrated to
> either lower or raise the sentence.

Pl.'s [235] Mem. at 10 (citing Tr. of Daubert Hr'g at 36-37, 50-52).[13]  Plaintiff contends that

Roberts' "methodology — comparing the relevant sentencing factors in a particular case to

thousands of prior sentences involving similar factors — is sound" because "[m]aking such

assessments in advising clients and, later[,] lawyers she supervised, was her stock-in-trade as a

highly regarded Assistant Public Defender, in which capacity she generated a considerable

volume of sentence comparators."  *Id.* at 1-2.

In tendering this argument, Plaintiff effectively conflates two separate questions under

Rule 702—whether the proffered opinion is "based on sufficient facts or data" and whether it is

"the product of reliable principles and methods."  FED. R. EVID. 702.  The Court does not doubt

that there will be some interplay between these questions where, as here, an expert relies

primarily on her experience and knowledge as a basis for her opinion.  "[N]o one denies that an

expert might draw a conclusion from a set of observations based on extensive and specialized

experience," *Kumho Tire*, 526 U.S. at 156, and in some cases, "the relevant reliability concerns

---

[13]  Elsewhere, Plaintiff describes the "principles" underlying Roberts' methodology in the
following manner:

> The major premises underlying her opinion are that similarly-situated
> individuals generally receive similar sentences; that sentencing is
> graduated and proportional; and that certain positive or sympathetic
> factors will tend to produce a lower sentence while certain negative
> or unsympathetic factors will tend to do the opposite.

Pl.'s [235] MEM. at 15.

may focus on personal knowledge or experience," *id.* at 150.  But that "does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261.  Even when an expert relies upon her experience, "the reliability criterion remains a discrete, independent, and important requirement for admissibility." *Id.*  Thus, where, as here, the expert relies "primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note (2000 amends.); *accord Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 1784 (2011).

Because the standards for the admission of expert testimony are flexible by design, the trial judge's discretion extends not only to her substantive judgment, but also to her threshold determination as to *how* reliability should be evaluated.  *Kumho Tire*, 526 U.S. at 152.  In this regard, the Court is in complete agreement with Plaintiff that the law does not support the rigid application of the factors articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[14]  The Court also agrees with Plaintiff that Roberts' testimony is not *per se* inadmissible simply because, as Plaintiff concedes, it is "unsupported by peer review" and "lack[s] statistical analysis or studies," Pl.'s [235] Mem. at 13, factors that are commonly associated with scientific or technical expert testimony.  The Court also accepts that the sort of testimony at issue in this case does not easily lend itself to scholarly

---

[14]  Those factors include: (1) whether the method can be and has been tested; (2) whether the method has been subjected to peer review and publication; (3) whether there is a high potential rate of error; (4) whether there are standards controlling the method's operation; and (5) whether the method enjoys general acceptance within the relevant community.  *See Daubert*, 509 U.S. at 592-94.

review or traditional scientific evaluation.  Nonetheless, the Court departs with Plaintiff to the extent she intends to suggest that the factors identified in *Daubert* are irrelevant in this case. *Daubert* should not be "slavishly applied" in this context.  *Id.* at 17.  But neither should it be disregarded.

Contrary to what Plaintiff may believe, "some of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony."  *Kumho Tire*, 526 U.S. at 151.  In particular, the Supreme Court has acknowledged that, in some cases, it will be appropriate to ask how often an expert's experience "has produced erroneous results."[15]  *Id.*  This happens to be one of those cases.  In this case, even while acknowledging that Gaither's conviction carried a possible sentence ranging from probation to thirty years' incarceration, Roberts' opinion is that, "had he lived, Mr. Gaither would have been sentenced to probation."  Roberts' Rep. at 1.  This is a *predictive* judgment, and a rather precise one at that.

Given the nature of the proffered opinion, the Court would expect Plaintiff to offer *some* indication of the "rate of error" of Roberts' predictive methodology.  *Daubert*, 509 U.S. at 594. To put it in the most simple terms, while the Court has no doubt that Roberts was consistently called upon to make predictive judgments about the sentence clients might receive in the course

---

[15]  Citing a solitary footnote from the opinion of the United States Courts of Appeals for the Ninth Circuit in *Living Designs, Inc. v. E.I. Dupont de Nemours and Company*, 431 F.3d 353 (9th Cir. 2005), Plaintiff claims that "considerations such as peer review and error rate are simply inapplicable to experience-based testimony."  Pl.'s [235] Mem. at 13 n.11.  To the extent *Living Designs* and its precursors in the Ninth Circuit stand for such a broad proposition, it is plainly contrary to the instructions of the United States Supreme Court.  Those instructions are clear: "[t]oo much depends upon the particular circumstances of the particular case at issue" to rule out certain factors identified in *Daubert* for "subsets of cases categorized by category of expert or by kind of evidence."  *Kumho Tire*, 526 U.S. at 150.  "[S]ome of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony," including the question of how often an "expert's experience-based methodology has produced erroneous results."  *Id.* at 151.

of her extensive and impressive career, there is no evidence in the record indicating how *good*

she was at making such judgments.  Roughly speaking, how often did Roberts' predictions turn

out to be correct?  When incorrect, how often were they "in the ballpark" and how often did they

deviate significantly from the sentence actually imposed?  These questions, which are left

unanswered in the record before the Court, are the sort of questions one would expect to be

addressed where a party intends to call a witness to make a predictive judgment like the one at

issue here, even when that judgment is primarily based on the expert's experience and not a more

rigorous scientific or technical inquiry.[16]  By this, the Court does not intend to suggest that

Plaintiff was somehow obligated to establish the reliability of Roberts' methodology to a

scientific or statistical certainty; even generalized evidence about how often Roberts'

methodology produces erroneous results might very well have sufficed in this case.  However,

the record created by the parties in this case is devoid of any such evidence.  At best, the record

suggests that Roberts' powers of prediction improved as her career progressed.  *See* Tr. of

Daubert Hr'g at 36-37, 55.  This evidence does not provide the Court with any metric, even a

---

[16]  *Simo v. Mitsubishi Motors North America, Incorporated*, 245 F. App'x 295 (4th Cir. 2007), an unpublished and non-precedential opinion in which the United States Court of Appeals for the Fourth Circuit upheld the trial court's discretionary admission of expert testimony concerning the earnings a soccer player likely would have earned as his career progressed, is not to the contrary.  Unlike Roberts, the expert in *Simo* engaged in a specific comparative analysis, "not[ing] as a point of comparison the salaries of eight then-current or former players." *Id.* at 300.  Moreover, unlike Roberts, the expert in *Simo* did not predict a precise outcome, but rather a wide range of outcomes.  His estimate covered a broad range from $3 million to $10 million, and he explained that his projection encompassed "'a range of averages,' rather than a precise prediction." *Id.* at 301.  Plaintiff also relies heavily on the United States Court of Appeals for the District of Columbia Circuit's opinion in *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), *cert. denied*, 549 U.S. 1137 (2007).  The Court fails to see the comparison.  In *Mejia*, the Court of Appeals upheld the trial judge's admission of expert testimony from a law enforcement agent as to the use of "code phrases" employed by drug traffickers. *Id.* at 448.  The case did not involve anything remotely akin to the sort of predictive judgment offered by Roberts in this case.

rough and non-scientific metric, to probe the reliability of Roberts' predictive methodology.  In the end, Roberts' "bald assurance of validity is not enough" for this Court.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995).[17]  On this record, Plaintiff has failed to satisfy the Court that Roberts' opinion that a reasonable judge would likely have sentenced Gaither to probation is "the product of reliable principles and methods."  FED. R. EVID. 702.

   iii.  "Reliably Applied"

   Nor is the Court satisfied that Roberts' methodology has been "reliably applied . . . to the facts of the case," FED. R. EVID. 702, to yield her opinion that a "reasonable judge" likely would have sentenced Gaither to probation.  As an initial matter, the Court harbors no small amount of doubt that such a methodology could ever reliably produce such a precise prediction.  Roberts' predictive methodology is meant to duplicate the "methodology" used by sentencing judges.  But that methodology, to the extent it may even be characterized as such, is fact-intensive, multi-faceted, open-ended, and discretionary.  Indeed, the courts of the District of Columbia recognize that two jurists, even when presented with the same set of facts, may reach different outcomes when "the discretionary, virtually non-reviewable act[,] of sentencing takes place."  *Belton v.*

---

  [17]  Further, whether a "method is generally accepted" in the community may be relevant in evaluating experience-based testimony.  *Kumho Tire*, 526 U.S. at 151.  Despite Plaintiff's assertions to the contrary, there is no basis in the record to conclude that Roberts' predictive methodology has gained "general acceptance" in the community.  *Daubert*, 509 U.S. at 594.  While Plaintiff may be correct that sentencing judges use a similar "methodology," they do *not* use it for the same purpose—that is, to make a *predictive* judgment about what sentence will be imposed in a given case.  To put in plainly, a sentencing judge *decides* what sentence is warranted in a particular case; her task is prescriptive and not predictive.  Unlike Roberts, the sentencing judge is not asked to make a guess about what another judge, vested with similarly broad discretion, might do if presented with an analogous case.

*United States*, 581 A.2d 1205, 1212 (D.C. 1991).   What is an appropriate sentence in a particular

case?  In the District of Columbia, as elsewhere, "reasonable men may and do differ on the

subject."  *Foster v. United States*, 290 A.2d 176, 179 (D.C. 1972).[18]  To put it another way,

reasonable minds could apply the same "methodology" as Roberts and end up with two different

and equally valid outcomes.  *See also* Tr. of Daubert Hr'g at 75-76, 84 (conceding that judges

could exercise their discretion differently).

     More to the point, Roberts' testimony at the *Daubert* hearing about how she applied her

methodology to Gaither's case was replete with generalities.  She repeatedly opined that certain

facts pertinent to Gaither's criminal case would be "critical," "significant," or a "huge plus" in

sentencing, while others would merit "some consideration" or would not be "dealbreakers."

Framed in such generalized and non-specific terms, the Court has no basis to meaningfully assess

whether Roberts has reliably applied her methodology to predict that a "reasonable judge" would

have sentenced Gaither to probation.   In the final analysis, it is not really clear what weight

Roberts herself applied to each factor, let alone why a "reasonable judge" would do the same.

     Plaintiff's reliance on a series of cases, none of them binding on this Court, addressing

the propriety of expert testimony on the "reasonable judge" in legal malpractice actions, is

misplaced.  *See* Pl.'s [235] Mem. at 20.  As the District observes, in legal malpractice actions, the

jurors' job is to put themselves in the place of the trier of fact in the prior legal action and to

determine "what the result *should have been*"—that is, to hold a "trial within a trial."  *In re*

*DeAtley Litig.*, No. CV-06-0278-JLQ, 2008 WL 375086, at *6 (E.D. Wash. Feb. 11, 2008).  The

---

    [18]  That observation is especially true where, as here, there was no mandatory minimum
sentence.  *See Dantzler v. United States*, 696 A.2d 1349, 1359 (D.C. 1997) ("Where no
mandatory minimum applies, sentencing decisions are quintessentially discretionary.").

goal is not to predict what a particular trier of fact would have done as a matter of historical fact or hypothesis. That fiction, which allows the jury to substitute its judgment for another trier of fact, does not apply in this context. Here, "the question is not what Mr. Gaither should have earned, but rather what he would have earned, a determination that depends in part on what sentence he would have received, not what sentence the jury believes he should have received." Def.'s [246] Mem. at 18.

Plaintiff also relies upon a series of cases in which a judge expressed some level of willingness to hear expert sentencing testimony before sentencing a criminal defendant or making a determination concerning release on bail. *See* Pl.'s [235] Mem. at 16-17. These cases, none of which are binding on this Court, are inapposite for myriad reasons, but only one need be mentioned here: the Federal Rules of Evidence, and by extension the entire inquiry at issue here, do not apply in such proceedings. *See* FED. R. EVID. 1101(d)(3). In the end, the authorities cited by Plaintiff simply are not apposite.

The Court's conclusion remains the same even after taking into account the historical sentencing data that Roberts reviewed in rendering her opinion. *See* Pl.'s [235] Mem. at 1 (claiming that "the historical sentencing data . . . shows that Ms. Roberts' applied her method reliably because this data strongly supports a conclusion that probation (or a similarly short sentence) was likely."). Strictly speaking, this evidence does not directly verify the reliability of Roberts' predictive methodology, which is based on her application of a multi-factored, discretionary balancing test to the facts of a particular case. Rather, as Roberts and Plaintiff suggest, the evidence at best "corroborates" or "boosts" her bottom-line opinion that Gaither likely would have been sentenced to probation had he survived. *Id.* at 11; *see also* Tr. of Daubert

Hr'g at 21 (stating that the historical data "confirmed the opinion that [Roberts] initially arrived at").  The historical data indicates that, between January 1, 1996 and June 30, 2003, 52% of individuals charged with the same offense as Gaither and falling in the same criminal history category received probation.  *See* App'x: Historical Data for Drug Grid ("Historical Data App'x"), ECF No. [235-11], at 1.  Meanwhile, 48% of those individuals were sentenced to some period of incarceration.[19]  *Id.*  But Plaintiff does not claim that Roberts (or, for that matter, anyone else) ever looked behind the data to determine the composition of these groups—that is, to determine how the factual circumstances of the criminal defendants behind the raw data coincide with the actual sentences imposed.  Without that connection, there is an unacceptable analytical disconnect between Roberts' opinion, her predictive methodology, and the historical data.  Stated differently, there is nothing in the data, or Roberts' analysis of the data, that reveals that she reliably concluded that Gaither would have fallen into the 52% of the group that received probation instead of the 48% who did not.

For this reason, and for the reasons set forth above, the Court is not satisfied that Roberts' methodology has been "reliably applied . . . to the facts of the case," FED. R. EVID. 702, to yield her opinion that a "reasonable judge" likely would have sentenced Gaither to probation in his criminal case.

---

[19]  Broken down in a different manner, 52% of the group received probation, 60.8% received a sentence of less than six months, 70.6% received a sentence of less than ten months, 80.4% received a sentence of less than fifteen months, and 90.2% received a sentence of less than twenty-four months.  *See* Historical Data App'x at 2.

2.      Rule 403

As observed by the Supreme Court, an expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. Accordingly, "sometimes expert opinions that otherwise meet the admissibility requirements [of Rule 702] may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263. Indeed, "Rule 403 exclusion based on unfair prejudice is particularly important in the case of expert evidence." *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 2443 (2011). In this case, even assuming, *arguendo*, that Roberts' proffered testimony would meet the requirements of Rule 702, the Court would exercise its discretion and conclude that whatever probative value such testimony would have would be "substantially outweighed" by "a danger of unfair prejudice . . . [and] misleading the jury." FED. R. EVID. 403. At the very best, the methodological foundation for Roberts' proffered opinion that Gaither would be sentenced to probation is "slender," and the danger that the jury would assign such testimony talismanic significance is too great. *Frazier*, 387 F.3d at 1263.

In sum, the Court finds that Plaintiff has failed to show that Roberts' opinion that a "reasonable judge" would have sentenced Gaither to probation is "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." FED. R. EVID. 702. Alternatively, the Court finds that whatever probative value such testimony would have would be "substantially outweighed" by "a danger of unfair prejudice . . . [and] misleading the jury." FED. R. EVID. 403. Accordingly, the Court shall preclude Roberts from testifying as to

28

how a "reasonable judge" would have sentenced Gaither.[20]

D.      *Roberts Can Provide Generalized Testimony About the Factors that a Judge*

*Might Take into Account When Sentencing a Criminal Defendant*

Despite the foregoing, the Court agrees that the jury will need some guidance in

determining what sentence Gaither likely would have received in order to calculate Plaintiff's

claimed compensatory damages, should they ever need to reach that question.   Laypersons are

unlikely to know the factors that judges are likely to consider in sentencing and, absent such

testimony, the jury in this case would have little at its disposal to evaluate what sentence within

the wide range of possible sentences Gaither might have received.   The Court declines to cast the

jury adrift in a sea of speculation.

In this regard, the Court finds that Roberts can testify, in general terms, as to the factors

that a judge might take into account in the course of sentencing a criminal defendant (*e.g.*, the

nature of the offense, prior criminal history, whether the offender pleads guilty or is convicted at

trial, social and family history, employment history, ties to the community, etc.).   *See* FED. R.

EVID. 702 advisory committee's note (2000 amends.) (recognizing that it might "be important in

some cases for an expert to educate the factfinder about general principles, without ever

---

[20]   The problems with Roberts' testimony would not be remedied if Roberts were to
hypothetically soften her opinion that Gaither would have received probation to an opinion that
"a sentence from probation to two years for Mr. Gaither was highly probable," which Plaintiff
asserted as a fallback position far too late in these proceedings.   Pl.'s [235] Mem. at 25.   While
such an opinion might be more consistent with the historical sentencing data, there would still be
insufficient support in the record to satisfy the Court that Roberts' opinion would be "the product
of reliable principles and methods" that are "reliably applied . . . to the facts of the case."   FED. R.
EVID. 702.

attempting to apply these principles to the specific facts of the case.").[21]   In addition, Roberts may

respond to appropriate hypothetical questions designed to elicit an opinion as to whether certain

factors would be a positive or negative consideration in sentencing.  *See Estate of Carey by

Carey v. Hy-Temp Mfg., Inc.*, 929 F.2d 1229, 1235 n.2 (7th Cir. 1991) ("[E]xpert witnesses may

be competent to give opinions based on hypothetical facts even though a foundation that the

expert has personal knowledge of those facts has not been laid.") (citation omitted).  For

example, Plaintiff's counsel may ask Roberts whether a criminal defendant's voluntary

cooperation in a grand jury investigation is likely to be viewed as a positive factor in determining

the defendant's ultimate sentence.  However, the use of such hypothetical questions shall be

conditioned upon Plaintiff's ability to lay a proper foundation connecting the hypothetical

scenarios to the actual facts of this case through other evidence or witnesses.

Meanwhile, the Court emphasizes that Roberts' testimony cannot stray into the following

areas: (1) her opinion of the sentence that Judge Kramer or a "reasonable judge" would have

imposed in Gaither's criminal case; (2) her opinion of how Judge Kramer was situated vis-à-vis

the "reasonable judge"; (3) her opinion of how a judge would allocate the weight between certain

factors (*e.g.*, an opinion that a judge would consider a criminal defendant's successful

participation in a drug rehabilitation program as more significant than subsequently testing

positive for drug use in violation of the defendant's terms of release); and (4) her interpretation

of Judge Kramer's, counsel's, or the probation officer's conduct or statements in Gaither's

---

[21]   "For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony 'fit' the facts of the case."  FED. R. EVID. 702 advisory committee's note (2000 amends.).

criminal case (*e.g.*, the reasons why Judge Kramer may have attended Gaither's graduation from a drug rehabilitation program).

With those provisos, in an exercise of its broad discretion, the Court shall permit Roberts to testify, in general terms, as to the factors that a judge might take into account in the course of sentencing a criminal defendant and to respond to appropriate hypothetical questions designed to elicit an opinion as to whether certain factors would be a positive or negative consideration in sentencing, leaving to the jury the task of determining which factors best fit the facts of this case. *See Miller*, 608 F.3d at 895 (upholding the trial judge's allowance of expert testimony describing generic economic principles, leaving the trier of fact to determine which scenario best fit the facts of the case).

### E.    Plaintiff's Motion to Supplement Shall Be Denied

In her [236] Motion to Supplement, Plaintiff seeks leave to supplement Roberts' written report to make reference to additional materials supporting Roberts' proffered opinion that a reasonable judge likely would have sentenced Gaither to probation—materials that Plaintiff claims to have discovered since the Court held the *Daubert* hearing, including a Presentence Investigation Report and transcripts of hearings before Judge Kramer.  In her proposed supplemental written report, Roberts references the additional materials as supporting "additional mitigating facts."  Suppl. Roberts' Rep. at 3.  Her underlying opinion, and accompanying methodology, remain fundamentally the same as in her original written report.  *See id.* at 1.  The Court has carefully considered these additional materials, and the corresponding changes made in Roberts' proffered supplemental report, and finds that they would not alter the Court's decision even if supplementation were permitted.  Most notably, like the historical sentencing data

31

Roberts relied upon previously, these additional materials at best corroborate or bolster Roberts'

underlying conclusion; they do not satisfy the Court that her opinion that a "reasonable judge"

would have sentenced Gaither to probation is "the product of reliable principles and methods"

that are "reliably applied . . . to the facts of the case." FED. R. EVID. 702.  At the same time, the

additional materials are specific to the facts of Gaither's case, and are therefore irrelevant to the

generalized testimony about sentencing factors that the Court has allowed.  Accordingly,

Plaintiff's [236] Motion to Supplement shall be DENIED because consideration of the proposed

supplemental report would not alter the Court's conclusion about the proper scope of Roberts'

testimony at trial.[22]

## V.  CONCLUSION AND ORDER

The Court has considered the remaining arguments tendered by the parties and has

concluded that they are either without merit or need not be addressed in light of the basis for the

Court's decision.  Therefore, and for the reasons set forth above, it is, this 19th day of December,

2011, hereby

**ORDERED** that Roberts is PRECLUDED from testifying as to (1) her opinion of the

sentence Judge Kramer likely would have imposed in Gaither's criminal case, (2) her opinion

that Judge Kramer was a "reasonable judge," "down the middle," and "not an outlier" in

sentencing, and (3) her opinion as to how a "reasonable judge" would have sentenced Gaither.

However, Roberts may testify, in general terms, as to the factors that a judge might take into

---

[22] Parenthetically, the Court observes that Plaintiff and Roberts offer a speculative interpretation of the additional materials and, in particular, Judge Kramer's statements on the record during proceedings in Gaither's criminal case.  However, no one claims that Roberts has an expertise in divining Judge Kramer's state of mind.

account in the course of sentencing a criminal defendant and respond to appropriate hypothetical questions designed to elicit an opinion as to whether certain factors would be a positive or negative consideration in sentencing.  Accordingly, Magistrate Judge Kay's [120] Memorandum Order is AFFIRMED in relevant part.

It is **FURTHER ORDERED** that Plaintiff's [236] Motion to Supplement is DENIED.

**SO ORDERED.**

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge