## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF MIKAL R. GAITHER,
by and through Pearl Gaither, Personal
Representative,

     Plaintiff,

   v.

DISTRICT OF COLUMBIA, *et al.*,

     Defendants.

Civil Action No. 03-01458 (CKK)

## MEMORANDUM OPINION
(December 19, 2011)

Plaintiff Pearl Gaither ("Plaintiff"), the representative of the estate of Mikal R. Gaither

("Gaither"), brings this action against the District of Columbia and a series of Individual

Defendants seeking damages in connection with Gaither's fatal stabbing while he was

incarcerated pending sentencing at the District of Columbia's Central Detention Facility.  The

Individual Defendants in this case fall into two groups: (1) Odie Washington, Marvin L. Brown,

and Dennis Harrison, three high-ranking officials in the District of Columbia's Department of

Corrections or the Central Detention Facility; and (2) Zerline Brooks ("Brooks"), Gounod

Toppin ("Toppin"), and Joseph White ("White"), the three line officers that were assigned to

Gaither's cellblock on the day of his death (collectively, the "Defendant Correctional Officers").

In this case, Plaintiff claims, among other things, that the Defendant Correctional Officers

violated 42 U.S.C. § 1983 ("Section 1983") by acting with "deliberate indifference" to a serious

risk of inmate-on-inmate violence that threatened Gaither's safety and proximately caused his

death, in contravention of his rights under the Fifth and Eighth Amendments to the United States

Constitution.  Currently before the Court is the Defendant Correctional Officers' [232/233]

Motion for Summary Judgment as to Plaintiff's Constitutional Claims Pursuant to 42 U.S.C. §

1983 ("Motion for Summary Judgment").  Relying upon the doctrine of qualified immunity, the

Defendant Correctional Officers now seek judgment in their favor on Plaintiff's Section 1983

claims against them in their personal capacities.  Upon careful consideration of the parties'

submissions, the relevant authorities, and the record as a whole, the Court shall GRANT the

Defendant Correctional Officers' [232/233] Motion for Summary Judgment.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in

detail the extensive factual and procedural background of this case.

### A.    Factual Background

On December 14, 2002, at approximately 5:40 p.m., Gaither was fatally stabbed by fellow

inmates while incarcerated in the District's Central Detention Facility.  *See Estate of Gaither ex*

*rel. Gaither v. District of Columbia* ("*Gaither₁*"), 655 F. Supp. 2d 69, 74 (D.D.C. 2009).  At the

time of his death, Gaither was awaiting sentencing in the Superior Court of the District of

Columbia, having already pleaded guilty to one felony count of distribution of cocaine.  *See id.* at

75.  The District of Columbia Metropolitan Police Department conducted an investigation into

the incident, ultimately concluding that two of Gaither's fellow inmates had forced Gaither into

an open cell and proceeded to stab him, resulting in his death.  *See id.* at 75-76.  Subsequently, a

grand jury found that Gaither had been killed because of his involvement in a separate grand jury

investigation into the murder of an individual by the name of Kenneth Muldrow.  *See id.* at 76.

At the time of his stabbing, Gaither was located in the Northeast Three Cellblock ("NE-

3") of the Central Detention Facility.  The Defendant Correctional Officers—Brooks, Toppin, and White—were the line officers that were assigned to NE-3 that day.  Pl.'s Resp. to Def. Correctional Officers' Stmt. of Material Fact to Which There Is No Genuine Dispute ("Pl.'s Resp. Stmt."), ECF No. [238], ¶¶ 1-3; Resp. to Pl.'s Resp. Stmt. Regarding Material Facts and Suppl. to Def. Correctional Officers' Stmt. of Material Facts Not in Dispute ("Defs.' Reply Stmt."), ECF No. [240-1], ¶¶ 1-3.  Toppin was the "bubble officer" and was designated as the "Officer-in-Charge."  Pl.'s Resp. Stmt. ¶¶ 19, 38; Defs.' Reply Stmt. ¶¶ 19, 38.  Brooks and White were serving as "floor officers."  Dep. of Zerline W. Brooks ("Brooks Dep."), ECF Nos. [233-2], [238-1], at 17, 119.  None of the Defendant Correctional Officers witnessed Gaither's stabbing.  Pl.'s Resp. Stmt. ¶ 48; Defs.' Reply Stmt. ¶ 48.

The Defendant Correctional Officers were required to maintain supervision over the cellblock at all times.  Pl.'s Resp. Stmt. ¶ 49; Defs.' Reply Stmt. ¶ 49.  It is undisputed that the Defendant Correctional Officers did not have a role in establishing formal policies at the Central Detention Facility.  Pl.'s Resp. Stmt. ¶¶ 4-6; Defs.' Reply Stmt. ¶¶ 4-6.  Nonetheless, at the time of Gaither's stabbing, the Central Detention Facility's "critical minimum staffing" policy required the presence of three correctional officers in NE-3 at all times.[1]  Pl.'s Resp. Stmt. ¶ 33; Defs.' Reply Stmt. ¶ 33.  It was impossible to maintain visual supervision over the entire

---

[1]  Although the Defendant Correctional Officers fail to dispute this proffered factual statement, they assert at other points in their briefing that the applicable staffing policy only required the presence of two correctional officers in NE-3.  As the Court has previously had the opportunity to observe, the evidence on this point is contradictory and the issue is not amenable to resolution at this stage of the proceedings. *Gaither₁*, 655 F. Supp. 2d at 89-91.  For purposes of resolving the pending motion, the Court shall draw the inference most favorable to Plaintiff as the non-movant—namely, that the critical minimum staffing policy at the time of the incident required the presence of three correctional officers in NE-3.

cellblock with less than three correctional officers.  Pl.'s Resp. Stmt. ¶ 35; Defs.' Reply Stmt. ¶ 35.  The "bubble officer" could not see into the cells, parts of the gym, and several areas of the cellblock tiers.  Pl.'s Resp. Stmt. ¶ 35; Defs.' Reply Stmt. ¶ 35.  Meanwhile, a single "floor officer" could not see cells on the opposite side of the cellblock or on the other side of the tier. Pl.'s Resp. Stmt. ¶ 35; Defs.' Reply Stmt. ¶ 35.  The difficulties in supervising inmates on the cellblock were compounded when all 160 inmates housed in NE-3 were released from their cells at once.  Pl.'s Resp. Stmt. ¶ 37; Defs.' Reply Stmt. ¶ 37.

In December 2002, two similar incidents of violence at the Central Detention Facility preceded Gaither's stabbing, albeit in different cellblocks.  While the Defendant Correctional Officers maintain that they were unaware of these prior incidents, there is evidence in the record that would permit a reasonable trier of fact to infer that such information was passed on to the Defendant Correctional Officers at roll calls prior to Gaither's stabbing.  Dep. of Gary A. Binson ("Binson Dep."), ECF Nos. [233-3], [238-2], at 133, 138-39; Dep. of Marvin L. Brown ("Brown Dep."), ECF No. [238-3], at 228-30; Am. Resps. to Reqs. for Admission, ECF No. [238-15], at 5-6.

### 1.    Defendant Brooks

At the time Gaither was attacked, there were only two guards physically present at NE-3—Toppin and White.  Pl.'s Resp. Stmt. ¶ 11; Defs.' Reply Stmt. ¶ 11.  Brooks left NE-3 at 5:30 p.m., shortly before Gaither was stabbed, in order to escort four diabetic inmates to the facility's infirmary to receive insulin shots.  Pl.'s Resp. Stmt. ¶ 7; Defs.' Reply Stmt. ¶ 7.  Upon her return to NE-3 at approximately 5:40 p.m., Brooks noticed Gaither running from the top right tier of the cellblock covered in blood.  Pl.'s Resp. Stmt. ¶ 21; Defs.' Reply Stmt. ¶ 21.

When Brooks left NE-3, the inmates on the cellblock were in the process of being fed. Stmt. of Material Fact to Which There Is No Genuine Issue ("Defs.' Stmt."), ECF No. [233], ¶ 9; Pl.'s Resp. Stmt. ¶ 9.  It is unclear whether the inmates were locked in their cells.  Brooks Dep. at 22; Dep. of Gounod Toppin ("Toppin Dep."), ECF Nos. [233-1], [238-4], at 197, 200-01; Pl.'s Ex. 5 at DC014137.  For purposes of the pending motion, the lack of clarity is immaterial.  The Command Center had "cleared the count" for NE-3 at 5:15 p.m., shortly before Brooks left the cellblock.  Brooks Dep. at 38-39, 80-81; Pl.'s Ex. 5 at DC014137.  Brooks concedes that, once the count is cleared by the Command Center, the guards on the cellblock release the inmates from their cells.  Brooks Dep. at 38-39.  Therefore, a reasonable trier of fact could infer that Brooks could have anticipated that it was likely that the inmates on NE-3 would be released sometime around the time she left the cellblock.  The parties agree that Brooks did not make the decision to release the inmates, whenever it occurred.  Defs.' Stmt. ¶ 25; Pl.'s Resp. Stmt. ¶ 25.

It is undisputed that Brooks was ordered by Toppin to leave NE-3 to escort inmates to the infirmary.  Pl.'s Resp. Stmt. ¶ 39; Defs.' Reply Stmt. ¶ 39.  Consistent with this account, Brooks testified at her deposition that she had no discretion in the matter.  Brooks Dep. at 65, 138. Nonetheless, Plaintiff maintains, with support in the record, that escorting inmates to the infirmary for insulin shots would not constitute the kind of emergency necessary to drop below the critical staffing requirement for the cellblock.  Binson Dep. at 31-36; Brown Dep. at 93-94. Instead, the appropriate response would have been to wait for a relief officer to be dispatched from the Command Center or to contact the Command Center to obtain such relief.  Binson Dep. at 31-36; Brown Dep. at 93-94.

At her deposition taken several years after the incident, Brooks testified that it "bothers"

her when there are less than three correctional officers in the cellblock.  Pl.'s Resp. Stmt. ¶ 36; Defs.' Reply Stmt. ¶ 36.  Indeed, Brooks testified that you "really need four" correctional officers.  Pl.'s Resp. Stmt. ¶ 36; Defs.' Reply Stmt. ¶ 36; Brooks Dep. at 46-47, 88-90.  Although Plaintiff challenges Brooks' failure to obtain relief prior to escorting inmates to the infirmary, it is undisputed that she played no role in the assignment of correctional officers to NE-3.  Defs.' Stmt. ¶ 29; Pl.'s Resp. Stmt. ¶ 29.

2.   Defendant Toppin

On the day of the incident, Toppin was the "bubble officer" and was designated as the "Officer-in-Charge."  Pl.'s Resp. Stmt. ¶¶ 19, 38; Defs.' Reply Stmt. ¶¶ 19, 38.   In that role, Toppin was responsible for making sure that relief was available prior to any officer leaving the cellblock.  Pl.'s Resp. Stmt. ¶ 38; Defs.' Reply Stmt. ¶ 38.

Toppin ordered Brooks to leave NE-3 to escort inmates to the infirmary to receive insulin shots.  Pl.'s Resp. Stmt. ¶ 39; Defs.' Reply Stmt. ¶ 39.  Toppin did so without attempting to secure relief for Brooks' post.  Pl.'s Resp. Stmt. ¶ 39; Defs.' Reply Stmt. ¶ 39.  According to Plaintiff, this was a violation of the facility's policy because it failed to maintain the critical staffing complement on the cellblock and Toppin should have instead called his supervisor to secure a relief officer to escort the inmates to the infirmary.  Pl.'s Resp. Stmt. ¶ 39; Defs.' Reply Stmt. ¶ 39.  At his deposition, Toppin explained that the Post Orders[2] for NE-3 at the time only required two guards to be in the cellblock at all times.  Toppin Dep. at 222-23.  However, the Post Orders themselves do not address specific staffing numbers, but instead refer to "post

_____

[2]  The Post Orders are designed to "[e]stablish policies and procedures for the safe, efficient and orderly operation of Housing Unit Northeast Three."  Pl.'s Ex. 7 at DC013063.

analysis charts" that have never been produced in this case.  Pl.'s Resp. Stmt. ¶ 12; Defs.' Reply

Stmt. ¶ 12.  In any event, at his deposition taken several years after the incident, Toppin testified

that he personally believed it was "impossible" to provide a "reasonable level of security" over

160 inmates in NE-3 with only two correctional officers.  Pl.'s Resp. Stmt. ¶ 36; Defs.' Reply

Stmt. ¶ 36.

Toppin was "unaware that there was a separate post for relief officers."  Pl.'s Resp. Stmt.

¶ 39 (citing Toppin Dep. at 63).  Rather, Toppin appears to have been operating under the

understanding that one of the three officers assigned to NE-3 was, in effect, the "relief officer"

for the shift.  Toppin Dep. at 62-63.  However, staffing rosters from the day of the incident show

that six officers were assigned to "Relief/Escort" above and beyond the staffing assignments for

each cellblock.  Pl.'s Ex. 12 at DC011269.

### 3. Officer White

At the time of Gaither's stabbing, White was manually closing the cell doors on the lower

right tier of NE-3.  Pl.'s Resp. Stmt. ¶¶ 40-41; Defs.' Reply Stmt. ¶¶ 40-41.  Policy required

closing cell doors immediately after they were opened in order to keep inmates from gaining

access to other inmates' cells.  Pl.'s Resp. Stmt. ¶ 43; Defs.' Reply Stmt. ¶ 43.  Closing the cell

doors manually was a lengthy process that could take a single guard as long as an hour to

complete.  Pl.'s Resp. Stmt. ¶ 42; Defs.' Reply Stmt. ¶ 42.

### B. *Procedural Background*

Plaintiff brings this action as the personal representative of Gaither estate.  The

procedural history of the case is extensive and has been recited at length elsewhere.  Over the

years, the Court has resolved a litany of discovery-related motions, dispositive motions, and

motions for reconsideration.  More recently in the litigation, the Court granted Plaintiff leave to

file a Third Amended Complaint in order to articulate an alternative theory of liability.  *See*

*Estate of Gaither ex rel. Gaither v. District of Columbia*, 272 F.R.D. 248 (D.D.C. 2011).  In her

Third Amended Complaint, Plaintiff claims, among other things, that the Defendant Correctional

Officers violated Section 1983 by acting with "deliberate indifference" to a serious risk of

inmate-on-inmate violence that threatened Gaither's safety and proximately caused his death, in

contravention of his rights under the Fifth and Eighth Amendments to the United States

Constitution.  *See* Third Am. Compl., ECF No. [228], ¶¶ 59-61, 69-78.

As a result of this development, which modestly expanded the legal scope of Plaintiff's

constitutional claims, the Court granted the Defendant Correctional Officers leave to revisit their

qualified immunity defense in a supplemental motion for summary judgment.  *See* Mem. Op. and

Order, ECF No. [225].  Previously, the Court had found the Defendant Correctional Officers'

treatment of the qualified immunity issue wanting, and had denied them summary judgment on

that basis.  *See Gaither$_I$*, 655 F. Supp. 2d at 94-99.

In accordance with the schedule set by the Court, the Defendant Correctional Officers

filed the pending Motion for Summary Judgment.  *See* Mem. of P. & A. in Supp. of Defs. Joseph

White, Zerline Brooks and Gonoud [sic] Toppin's Mot. Judgment [sic] Plaintiff's [sic] Claims

[sic] Constitutional Claims Pursuant to 42 U.S.C. § 1983 ("Defs.' Mem."), ECF No. [233].

Plaintiff filed an opposition.  *See* Pl.'s Mem. of Law in Opp'n to Def. Correctional Officers' Am.

Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. [237].  The Defendant Correctional Officers filed a

reply.  *See* Reply Br. to Pl.'s Mem. of P. & A. in Opp'n to Defs. Joseph White, Zerline Brooks

and Gonoud [sic] Toppin's Am. Mot. for Summ. J. as to Pl.'s Constitutional Claims Pursuant to

42 U.S.C. § 1983 ("Defs.' Reply"), ECF No. [240]. The motion is therefore fully briefed and ripe for a decision. In an exercise of its discretion, the Court finds that holding oral argument on the motion would not assist the Court in rendering its decision. *See* LCvR 7(f).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] . . . is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact

undisputed for purposes of the motion." FED. R. CIV. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his, her, or its favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted," *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

### III. PRELIMINARY MATTERS

As a preliminary matter, Plaintiff argues that the Defendant Correctional Officers' [232/233] Motion for Summary Judgment should be denied outright and in its entirety because, in contravention of this Court's prior instructions, their opening memorandum cites directly to evidence in the record rather than to their statement of material facts. *See* Pl.'s Opp'n at 7-8. Unfortunately, this is not the first time that the Court has had the opportunity to address the Defendant Correctional Officers' chosen approach. Previously, in connection with the very same subject matter underlying the pending Motion for Summary Judgment, the Court chastised the

10

Defendant Correctional Officers for "fail[ing] to couple their factual arguments with specific

citations to their accompanying statement of material facts and instead improperly cit[ing]

directly to evidence in the record."  Mem. Op. and Order, ECF No. [225], at 6.  As the Court

observed then, such an approach "obscure[s] whether the facts relied upon [are] disputed."  *Id.*

Despite this admonition, the Defendant Correctional Officers' opening memorandum in

connection with the pending Motion for Summary Judgment adopts the identical approach

previously found wanting by the Court.  Conspicuously absent from the Defendant Correctional

Officers' opening memorandum is a single reference to their statement of materials facts.

Instead, the Defendant Correctional Officers once again cite exclusively to evidence in the

record.[3]  Once again, this obscures whether the facts relied upon by the Defendant Correctional

Officers are disputed and "impermissibly shifts counsel's burden to locate and identify the

relevant facts, and leaves this Court to guess which of the many factual statements set forth in

[the Defendant Correctional Officers' opening memorandum] are disputed and, if disputed,

whether the dispute is genuine."  *Glass v. LaHood*, 786 F. Supp. 2d 189, 199 (D.D.C.), *aff'd*, No.

11-5144 (D.C. Cir. Dec. 8, 2011) (unpublished summary affirmance).  As the Defendant

Correctional Officers were previously warned, such an approach is unacceptable.

Counsel for the Defendant Correctional Officers, C. Vaughn Adams, Esq., admits the

non-compliance, explaining that he cited directly to evidence in the record "[t]hrough habit

developed during years of practice" and submitting that the Defendant Correctional Officers

"should not be penalized" for counsel's error.  Defs.' Reply at 2.  Of course, the Court would

---

[3]  In contrast, the Defendant Correctional Officers' reply memorandum cites to the
parties' statements of material facts, directly referencing evidence in the record only for purposes
of emphasizing key facts, areas of disagreement, and the like.

expect that one "habit" that would be developed during years of practice is adherence to the instructions of the presiding judge, but the Court shall not belabor the point.  Under the unique circumstances in this case, the Court declines to exercise its discretion to visit the "sins of counsel" upon the innocent Defendant Correctional Officers by denying the pending Motion for Summary Judgment outright and in its entirety, a step that would deprive the Defendant Correctional Officers of their qualified immunity defense, which implicates an immunity from suit that is effectively lost if this case proceeds to trial.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Nonetheless, the Court declines to sift through the Defendant Correctional Officers' submissions in order to crystallize the record for the parties.  In an exercise of the Court's discretion, factual assertions absent from the parties' statements of material facts or not readily discernible from the face of the parties' pleadings shall be disregarded.  To the extent this affects the outcome of the pending motion, the fault and accountability must rest with the Defendant Correctional Officers, and not Plaintiff or this Court.

## IV.  DISCUSSION

Through her Section 1983 claims, Plaintiff contends that the Defendant Correctional Officers acted with "deliberate indifference" to a serious risk of inmate-on-inmate violence that threatened Gaither's safety and proximately caused his death, in violation of his rights under the Fifth and Eighth Amendments to the United States Constitution.[4]  It is well-established that "prison officials have a duty to protect prisoners from violence at the hand of other prisoners."

---

[4]  It remains to be definitively resolved which Amendment should apply to the facts of this case, something that turns on Gaither's detention status at the time of his death.  *See Gaither₁*, 655 F. Supp. 2d at 84-88.  However, because the parties are in agreement that the legal principles governing the pending motion are identical under both Amendments, the Court need not, and shall not, resolve the matter here.

*Farmer v. Brennan*, 511 U.S. 831, 833 (1994) (internal quotation marks, notations, and citation omitted). Plaintiff can prevail on her claim if she establishes both (1) that the challenged conditions of incarceration posed a "substantial risk of serious harm," and (2) that the Defendant Correctional Officers' state of mind was one of "deliberate indifference" to inmate health or safety. *Id.* at 834.

By its terms, this standard requires "more than mere negligence." *Id.* at 835. While a defendant need not act with "the purpose of causing harm" or the "knowledge that the harm will result," he must nonetheless be *deliberately* indifferent. *Id.* "[I]t is not enough . . . that the guard *ought* to have recognized the risk," *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004) (emphasis in original); he must both know of and disregard an excessive risk to inmate health or safety, *Farmer*, 511 U.S. at 835. In other words, not only must the defendant be "aware of facts from which the inference could be drawn that a substantial risk of harm exists," he must actually and consciously "draw the inference." *Id.* at 837. Thus, a plaintiff may not recover based on "an official's failure to alleviate a significant risk that he should have perceived but did not." *Id.* at 838. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations and quotations omitted); *see also Hope v. Pelzer*, 536 U.S. 736, 738 (2002) (the district court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious").

In this case, Plaintiff contends that the Defendant Correctional Officers were "deliberately indifferent" by exposing the inmates in NE-3, including Gaither, to a substantial threat of an

13

inmate-on-inmate attack.  Specifically, Plaintiff alleges that the Defendant Correctional Officers "left the unit woefully understaffed, failed to maintain supervision over the inmates, released all inmates from their cells to roam freely about, allowed the cell doors to remain open for an extended periods [sic] of time, violated numerous jail policies, and displayed a complete disregard to the unsafe conditions of the jail."  Pl.'s Opp'n at 21; *see generally* Third Am. Compl., ECF No. [228], ¶¶ 59-61, 69-78.

In their [232/233] Motion for Summary Judgment, the Defendant Correctional Officers argue that they enjoy qualified immunity from Plaintiff's Section 1983 claims against them in their personal capacities.  "Qualified immunity shields federal and state officials from suit unless a plaintiff alleges facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. Al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[C]onduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable officer would have understood that what he is doing violates that right."  *Id.* at 2083 (internal quotation marks and notations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The district court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In this case, the Court's analysis begins and ends with the second prong of the qualified immunity inquiry.[5]  For the reasons set forth below, the Court finds

_____

[5]  Plaintiff suggests that the Court should read the Defendant Correctional Officers' Motion for Summary Judgment as confined to the first prong of the qualified immunity analysis. Such a miserly interpretation is unwarranted.  While the Defendant Correctional Officers' papers

that the contours of the right at issue in this case were not sufficiently clear that every reasonable officer would have understood that the Defendant Correctional Officers' actions violated that right.

The second prong of the qualified immunity analysis "insulates officials from liability when a *legal question* governing their conduct is unclear, not when a jury question concerning their conduct is close." *Harris v. District of Columbia*, 932 F.2d 10, 16 n.4 (D.C. Cir. 1991) (emphasis in original).  Succinctly stated, "[i]f the law did not put the officer on notice that his conduct would be *clearly unlawful*, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added).  As a result, qualified immunity operates to protect an officer when he "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 199, 198 (2004) (*per curiam*) (citing *Saucier*, 533 U.S. at 206). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Al-Kidd*, 131 S. Ct. at 2085 (internal quotation marks and citation omitted).

In her opposition, Plaintiff argues at considerable length that the alleged constitutional violation was "clearly established" at the time of Gaither's death. *See* Pl.'s Opp'n at 20-23.  In so doing, she cites to a total of five cases addressing the "deliberate indifference" standard.  Two of those decisions—*Hope v. Pelzer*, 536 U.S. 736 (2002), and *Farmer v. Brennan*, 511 U.S. 831

---

certainly could and should have been more clear—for example, by segregating their analysis between the two prongs—their papers were sufficient to put Plaintiff on notice that both prongs of the qualified immunity analysis were in dispute. *See, e.g.*, Defs.' Mem. at 12 (claiming that the Defendant Correctional Officers "in good faith believed that their actions were reasonable and lawful").  In any event, because Plaintiff has already taken the opportunity to address the second prong at great length in her opposition, the Court shall, in an exercise of its discretion, reach the issue here. *See* Pl.'s Opp'n at 20-23.

(1994)—originate from the United States Supreme Court.  One—*Morgan v. District of Columbia*, 824 F.2d 1049 (D.C. Cir. 1987)—originates from the United States Court of Appeals for the District of Columbia Circuit.  Two more—*Hardy v. District of Columbia*, 601 F. Supp. 2d 182 (D.D.C. 2009), and *Austin v. District of Columbia*, Civil Action No. 05-2219 (JDB), 2007 WL 1404444, at *9 (D.D.C. May 11, 2007)—originate from this Court.

    A.    *Plaintiff's Reliance on Decisions from this Court Post-Dating the Conduct at Issue is Misplaced*

It appears from this collection of cases that Plaintiff misapprehends how the "clearly established" inquiry actually works in practice.  As an initial matter, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged *against the backdrop of the law at the time of the conduct*."  *Brosseau*, 543 U.S. at 198 (emphasis added).  For this reason, with one exception that is of no help to Plaintiff,[6] decisions post-dating the conduct at issue "are of no use in the clearly established inquiry."  *Id.* at 200 n.4.  In this case, because the challenged conduct occurred on December 14, 2002, Plaintiff's reliance on *Hardy* and *Austin*, which were decided in 2009 and 2007 respectively, is misplaced.

Even if this were not the case, there is an established hierarchy of legal authority that Plaintiff altogether ignores.  In evaluating whether the constitutional violation was "clearly established," this Court's first resort is to cases from the United States Supreme Court and the United States Court of Appeals for the District of Columbia Circuit, and only thereafter to cases from other courts "exhibiting a consensus view—if there is one."  *Bame*, 637 F.3d at 384

---

    [6]  Cases post-dating the challenged conduct may be considered if they reflect the "uncertain state of the law" at the relevant point in time.  *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011); *see also infra* Part IV.D.

(internal quotation marks and citation omitted).  Absent controlling authority from the Supreme Court or the Court of Appeals, the consensus view must be "robust."  *Al-Kidd*, 131 S. Ct. at 2084.  However, neither *Hardy* nor *Austin* reflect a robust consensus view that is relevant to the actual facts at issue in this case.

True, in *Hardy*, this Court was faced with comparable allegations that prison guards failed to supervise, monitor, and deter inmate-on-inmate assaults.  *See Hardy*, 601 F. Supp. 2d at 186, 189-90.  However, in finding that the plaintiffs in that case alleged enough factual matter to state a sufficiently plausible "deliberate indifference" claim to survive a motion to dismiss, the Court emphasized that the defendants in that case were alleged to be "at the top of the chain of command," possessing "complete knowledge of the long history" of violations at the facility in question.  *Id.* at 190.  Indeed, they were among the highest-ranking officials responsible for supervising the facility, and were therefore uniquely positioned to make policy decisions affecting inmate health and safety.  In sharp contrast, the Defendant Correctional Officers are merely the line officers that were assigned to Gaither's cellblock on the day in question.  Even assuming, counter-factually, that *Hardy* had been decided prior to Gaither's death, nothing in that decision would have put the Defendant Correctional Officers on notice that their actions would be adjudged as if they, again counter-factually, had the authority to make wide-ranging changes to the operations and policies of the Central Detention Facility.  *Cf. Farmer v. Moritsugu*, 163 F.3d 610, 615 (D.C. Cir. 1998) (*per curiam*) (noting that the defendant was not the person responsible for making the pertinent determination giving rise to the alleged constitutional harm).  Both in terms of their knowledge and agency, the Defendant Correctional Officers and the defendants in *Hardy* simply are not similarly situated.

This Court's unpublished decision in *Austin* is even more inapposite. In that case, the plaintiff claimed that the defendant failed to provide him access to adequate medical treatment despite being on actual notice of the underlying medical condition; there was no claim in the mold of the one asserted in this case. *See Austin*, 2007 WL 1404444, at *7-8.

In short, the Court finds that *Hardy* and *Austin* do not support a finding that the constitutional violation alleged in this case was "clearly established" at the time of Gaither's death.

B.     *Plaintiff's Remaining Authorities Do Not Show that the Alleged Constitutional Violation Was "Clearly Established"*

The Court therefore turns to the three remaining authorities relied upon by Plaintiff, which at least were decided before the conduct at issue and are binding on this Court.

First, the Court of Appeals' decision in *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C. Cir. 1987), which Plaintiff cites only for the general and unremarkable proposition that a prisoner has a constitutional right to be protected from the unreasonable threat of violence from his fellow inmates, *see* Pl.'s Opp'n at 21, is of no help to Plaintiff. The Court of Appeals' decision in that case was confined to the propriety of the district court's resolution of post-trial motions relating to the Section 1983 claims asserted against the District of Columbia itself. The Court of Appeals did not address the plaintiff's claims against the individual officers, which were dismissed before the end of the trial. *See id.* at 1055. For this reason, the Court of Appeals analyzed the "deliberate indifference" standard with reference to a broad range of actors, imputing all their knowledge and systemic failings to the District of Columbia. *See id.* at 1058-61. In other words, as was the case with *Hardy*, the Defendant Correctional Officers and the

18

defendants in *Morgan* are not similarly situated.  *Morgan* involved a different kind of case altogether, one that turned in large part on the contours of municipal liability under Section 1983. Apart from articulating the general legal framework for "deliberate indifference" claims, a matter addressed below, the decision would have provided no meaningful guidance to line officers like the Defendant Correctional Officers, let alone such guidance that would show that the specific constitutional violation alleged in this case was "clearly established" at the time of Gaither's death.

Second, Plaintiff's reliance on the Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 736 (2002), is similarly misplaced, albeit for different reasons.  While that case did involve claims against lower-level prison guards, the nature of the conduct at issue in that case was so radically different from the alleged constitutional violation in this case that it need not detain this Court long.  In *Hope*, even though the plaintiff had already been "subdued, handcuffed, placed in leg irons, and transported back to the prison," thereby abating any safety concerns, prison guards nonetheless proceeded to knowingly and unnecessarily handcuff the plaintiff to a "hitching post" for seven hours, exposing him "to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." *Id.* at 738.  As the Supreme Court found, this "wanton treatment was not done of necessity, but as punishment." *Id.* at 745.  Quite simply, Plaintiff's suggestion that the Defendant Correctional Officers' alleged conduct in this case involves anything even remotely approximating the "obvious cruelty" at issue in *Hope* is not well taken.  *See* Pl.'s Opp'n at 23.

Finally, in *Farmer v. Brennan*, 511 U.S. 831 (1994), the Court did not actually reach the merits of the case, instead remanding for further development of the factual record.  Rather, the

focus of the Supreme Court's opinion was articulating the principles applying to "deliberate indifference" claims generally, a matter the Court addresses below.  Regardless, the allegations in *Farmer* were likewise radically different than those now before the Court.  The claim in that case focused on allegations that the defendants transferred the plaintiff, a "diagnosed" transsexual who had undergone estrogen therapy and physical surgery, to a unit especially prone to sexual assaults.  *See id.* at 829-31.

C.      *Plaintiff's Reliance Upon the General Principles Governing "Deliberate Indifference" Claims Is Similarly Misplaced*

Plaintiff does not actually appear to rely on the five authorities cited in her opposition for their actual factual matter.  Indeed, with the exception of *Hardy*, the cases do not receive any meaningful factual exegesis anywhere in Plaintiff's analysis of the "clearly established" inquiry.  *See* Pl.'s Opp'n at 20-23.  Rather, Plaintiff relies on these authorities primarily insofar as they relate the principles governing "deliberate indifference" claims generally.  Such an approach, as applied to the facts of this case, is misguided.

At the outset, the Court pauses to acknowledge that when a district court is called upon to determine whether a constitutional violation was "clearly established" at a particular moment in time, it need not find that the facts of the prior case law are identical or even substantially similar to the facts at hand—provided, that is, that the state of the law at the time of the incident gave the defendant fair warning that his actions were unconstitutional.  *Bame*, 637 F.3d at 384.  In other words, although there need not be a case "directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Al-Kidd*, 131 S. Ct. at 2083.  Significantly, the Supreme Court has repeatedly warned courts "not to define clearly established

law at a high level of generality." *Id.* at 2084. The "clearly established" inquiry "must be
undertaken in light of the specific context of the case, not as a broad general proposition."
*Saucier*, 533 U.S. at 201. "[T]he right that the official is alleged to have violated must have been
'clearly established' in a more particularized, and hence more relevant sense." *Anderson*, 483
U.S. at 649.

Plaintiff glosses over these principles entirely in her opposition. *See* Pl.'s Opp'n at 20-
23. Instead, she characterizes the constitutional violation in this case as the failure to take
reasonable measures to guarantee the safety of inmates from violence at the hands of other
prisoners, or in a similarly broad manner. *See id.* at 21. So framed, the legal standards identified
by Plaintiff are, like the legal landscape confronted by the Supreme Court in *Brosseau v. Haugen*,
543 U.S. 199 (2004) (*per curiam*), cast at an unacceptably "high level of generality." 543 U.S. at
199. The general and unremarkable proposition that an officer's deliberate indifference to inmate
health and safety may run afoul of the Fifth and Eighth Amendments "is of little help in
determining whether the violative nature of [the] particular conduct [at issue in this case] is
clearly established." *Al-Kidd*, 131 S. Ct. at 2084. Indeed, allowing Plaintiff to frame the "clearly
established" right in such a broad and unilluminating manner would allow her "to convert the
rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging
violation of extremely abstract rights." *Anderson*, 483 U.S. at 639.

The Court does not doubt that, in "an obvious case," the general principles applicable to
"deliberate indifference" claims "can 'clearly establish' the answer, even without a body of
relevant case law." *Brosseau*, 543 U.S. at 199. The punitive use of the hitching post at issue in
*Hope* arguably provides such an "obvious" example. *See Hope*, 536 U.S. at 741 ("Arguably, the

violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution."). This case, however, does not present such an obvious case. Distilled to its essence, the record shows that, on the day of the incident, White left NE-3 in order to escort diabetic inmates to the infirmary to receive insulin shots at the direction of the officer-in-charge without securing a relief officer, knowing that the inmates had been or were likely to be imminently released from their cells, knowing that it would be more difficult for the remaining officers to supervise the inmates once released from their cells, and believing that you "really need four" officers to supervise NE-3; Toppin, as the officer-in-charge, failed to obtain relief for Brooks before she left the cellblock, unaware that there was a separate post for relief officers, while believing it was impossible to supervise all the inmates on the cellblock with two officers; and White remained on the floor and was occupied with a task that he was required to perform, albeit allegedly not as quickly as would have been desirable. It is undisputed that the Defendant Correctional Officers never had a role in making formal policy at the Central Detention Facility and there is nothing in the record to suggest that the Defendant Correctional Officers had any authority or power over broader staffing and safety conditions.

The Court need not decide whether this factual record does or does not in fact amount to a constitutional violation. Rather, the important point is that Plaintiff has not and cannot point to *a single case* predating the challenged conduct that would indicate that the precedent existing at the time of Gaither's death "placed the . . . constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083. In the final analysis, after reviewing the legal landscape "in light of the specific context of this case" and "not as a broad general proposition," *Saucier*, 533 U.S. at 201, the Court cannot conclude that the Defendant Correctional Officers were on notice that their conduct

would be "clearly unlawful," *id.* at 202.[7]  Accordingly, summary judgment based on qualified

immunity is appropriate.

      D.     *The Court's Conclusion is Supported by the Divergence of Conclusions as to How*

              *the "Deliberate Indifference" Standard Applies in this Context*

As discussed above, the general rule is that a district court may not consider cases post-

dating the conduct at issue or non-precedential cases that are not reflective of a robust consensus

in determining whether the alleged constitutional violation was "clearly established" at the time

of the challenged conduct.  However, cases post-dating the challenged conduct may be

considered if they reflect the "uncertain state of the law" at the relevant point in time.  *Bame*, 637

F.3d at 384.  In addition, the district court may consider whether "lower courts have reached

divergent conclusions" as to how a broad constitutional standard applies in a particular fact

situation.  *Safford Unified Sch. Dist. No. 1 v. Redding*, __ U.S. __, 129 S. Ct. 2633, 2643 (2009).

In this case, a review of the case law falling with this category reveals that there is, at the

very least, a divergence of conclusions as to how the "deliberate indifference" standard applies to

---

    [7]  This remains true even if the Court assumes, as Plaintiff presses, that the Defendant Correctional Officers ran afoul of the Central Detention Facility's policies governing staffing and like matters.  The Court does not doubt that regulations and policies may, in appropriate circumstances, provide a reasonable officer with warning that his conduct might be unconstitutional.  Indeed, in *Hope*, the Supreme Court examined a state correctional regulation in determining whether the defendants had fair warning of the unconstitutionality of their conduct.  *See Hope*, 536 U.S. at 741.  However, the relationship between the regulations and the constitutional violation in that case was far less attenuated than it is in this case: if the defendants in *Hope* followed the regulation at issue, that would have transformed the very "wanton" constitutional practice from a punitive to correctional measure.  *See id.* at 744.  Furthermore, the Supreme Court emphasized that the defendants "frequently" disregarded the regulation, evidencing a "course of conduct" tending to prove that "they were fully aware of the wrongful character of their conduct."  *Id.*  Meanwhile, the record in this case does not establish a comparable course of conduct indicative of the state of mind required to support a "deliberate indifference" claim.

line officers charged with failings similar to those challenged in this action. *See Burnley v. Evans*, 249 F. App'x 492, 493-94 (8th Cir. 2007) (*per curiam*) (concluding that even if guard released inmates in violation of a policy requiring continuous supervision of inmates, the record at best showed "mere negligence"); *Tucker v. Evans*, 276 F.3d 999, 1001-02 (8th Cir. 2002) (concluding that even if there was a substantial risk of harm to inmates, allegations that an officer in the control booth failed to properly supervise the unit and perform inspection duties "fail[ed] to rise to the level of a constitutional wrong" and at best demonstrated negligence); *Jones v. Allen Parish Correctional Ctr.*, No. 06-0056, 2008 WL 726077, at *3 (W.D. La. Mar. 20, 2008) (concluding that allegations that officers in the control room allowed a fellow inmate to gain access and fatally stab another inmate were insufficient, even where officers acknowledged that it would be "better" to have additional staff on the floor); *Muhammad v. Sielaff*, No. 91 Civ. 7275 (LAP), 1995 WL 459244, at *7 (S.D.N.Y. Aug. 3, 1995) (concluding that plaintiff's allegations that correctional officers did not pay "close enough attention to their responsibilities to monitor inmates" or were not at their "proper post" did not rise "to the level of culpability required for deliberate indifference," but rather were consistent with negligence); *but see Krein v. Norris*, 309 F.3d 487, 491-92 (8th Cir. 2002). This divergence of opinions further evidences that a reasonable officer in the Defendant Correctional Officers' position could have believed that his conduct was within the bounds of an appropriate response.

## V.  CONCLUSION

For the reasons set forth above, the Court finds that the constitutional violation alleged in this case was not "clearly established" at the time of Gaither's death, rendering summary judgment based on qualified immunity appropriate.   Accordingly, the Court shall GRANT the

Defendant Correctional Officers' [232/233] Motion for Summary Judgment and DISMISS

Plaintiff's Section 1983 claims against the Defendant Correctional Officers in their personal

capacities.  An appropriate Order accompanies this Memorandum Opinion.


Date:   December 19, 2011

                                    _____/s/_____
                                    **COLLEEN KOLLAR-KOTELLY**
                                    United States District Judge